NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1423-11T4
            A-0195-12T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARK C. SHEPPARD,

    Defendant-Appellant.
_____

APPROVED FOR PUBLICATION

September 3, 2014

APPELLATE DIVISION

Argued (A-1423-11) and Submitted (A-0195-12)
March 5, 2014 — Decided September 3, 2014

Before Judges Sapp-Peterson, Lihotz and Hoffman.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 09-12-02182.

Joseph P. Rem, Jr., argued the cause for appellant in A-1423-11 (Rem Zeller Law Group, attorneys; Mr. Rem, of counsel and on the brief; James B. Seplowtiz, on the brief).

Catherine A. Foddai, Senior Assistant Prosecutor, argued the cause for respondent in A-1423-11 (John L. Molinelli, Bergen County Prosecutor, attorney; Ms. Foddai, of counsel and on the brief).

Rem Zeller Law Group, attorneys for appellant in A-0195-12 (Joseph P. Rem, Jr., of counsel and on the brief; James B. Seplowtiz, on the brief).

John L. Molinelli, Bergen County Prosecutor, attorney for respondent in A-0195-12 (Catherine A. Foddai, Senior Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

HOFFMAN, J.A.D.

Defendant Mark Sheppard appeals from the judgment of conviction entered following a jury trial, where he was found guilty of second-degree aggravated assault and four other offenses, arising out of the stabbing of a Hispanic man. Defendant claims trial error regarding admission of evidence to prove an anti-Hispanic motive for the crimes charged, including a video-recorded encounter between defendant and the police subsequent to the stabbing. He had separately filed an appeal from the denial of a suppression motion and resulting convictions of two weapons offenses. These appeals are consolidated for purposes of this opinion. After careful review, we affirm the denial of defendant's suppression motion and weapons-offense convictions, but we reverse and remand for a new trial on the aggravated assault charge and related offenses.

I.

On December 4, 2009, a Bergen County grand jury returned an eight-count indictment against defendant, charging him with first-degree attempted murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-1 (count one); second-degree aggravated assault, N.J.S.A.

2

2C:12-1(b)(1) (count two); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) (count three); third-degree possession of a weapon (a knife) for unlawful purposes, N.J.S.A. 2C:39-4(d) (count four); fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(2) (count five); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1) (count six); second-degree possession of a weapon (a handgun) by a previously convicted felon, N.J.S.A. 2C:39-7(b) (count seven); and fourth-degree possession of weapons (switchblade knives) by a previously convicted felon, N.J.S.A. 2C:39-7(a) (count eight). The trial court granted defendant's motion to sever counts seven and eight for a separate trial. Twenty-two months after the stabbing incident and less than two months before trial, defendant filed a notice of claim of self-defense.

Over a period of twelve days, in June and July 2011, defendant was tried on the charges set out in the first six counts of the indictment. We glean the following facts from the trial record.

Born in El Salvador, J.I. came to the United States in 1999. He obtained the necessary visa to remain here legally in 2000, and maintained his visa until 2005, when he became an undocumented alien.

3

On July 4, 2009, J.I. attended the Independence Day parade in Ridgewood. After the parade, J.I. went to a tree-shaded area in a utility right-of-way, where there sits a large concrete pad, known locally as "The Rock." J.I. hung out there with friends and got drunk, becoming boisterous, and his friends eventually left. Sometime later, defendant appeared and had an altercation with J.I.; as a result, J.I. suffered near-fatal stab wounds and lost consciousness.

At approximately 9:00 p.m., members of the Waldwick Police Department were dispatched to investigate a report of an injured male lying on the ground near a restaurant on Franklin Turnpike. On arrival, the police officers found J.I. lying on his back, unresponsive; minutes later, an ambulance rushed J.I. to Hackensack University Medical Center (HUMC). Dr. Roger Keys, a trauma surgeon at HUMC, testified J.I. sustained stab wounds on both sides of his chest; he also found lacerations on J.I.'s right hand, which he described as "probably defensive wounds." J.I. lost about four pints of blood and would have bled to death had he not received treatment when he did. J.I. remained in the hospital for eight days, and could not return to work for thirteen months.

J.I. described the stabbing, stating his assailant twice yelled for him to "shut the fuck up," prior to attacking; he did

4

not hear the assailant utter any anti-Hispanic epithets. When the police showed him a "photo lineup," he could not identify his assailant.

The police brought a tracking dog to the area where they found J.I., and the dog followed a trail of blood to a deck on the side of defendant's house, approximately 900 feet away. Two officers looked into a window of defendant's closed garage door and observed a blood-covered bicycle resting on the floor of the garage. The police knocked on the front door and called defendant's telephone number, but received no response. The police then waited for a detective to arrive.

At about 10:30 p.m., Detective John Frazer of the Bergen County Prosecutor's Office arrived on the scene. After conferring with a police officer, Detective Frazer walked to defendant's home, shined a flashlight into the garage window, and observed the blood on the bicycle and floor. He then went to the side deck where he observed blood on the deck in front of a sliding glass door; while the living room lights were off, he could see the "glimmer of a T.V. in the living room."

After searching around the outside of the house, Detective Frazer had an extensive conversation with the police officers present about their inability to contact anyone within the house. Concerned about the "copious amount of blood" on the

5

bicycle and on the garage floor, as well as the circumstance that no one was answering the door or telephone, Detective Frazer decided to enter the house to "see if we could find an injured person or an unresponsive person . . . ." Detective Frazer decided to enter the home without a search warrant because, in his experience, it would take several hours to obtain a search warrant and an incapacitated person might not survive such a wait.

The police entered the unlocked front door of defendant's house at approximately 11:30 p.m. The police did not find anyone present, and the search ended at 11:47 p.m. Detective Frazer then returned to "The Rock," where he learned that the police had been notified by Valley Hospital that defendant had been admitted to the emergency room three hours earlier.

Detective Frazer then left to obtain a search warrant for defendant's home. After obtaining a warrant, the police searched defendant's home and were finished before 7:30 a.m. on July 5, 2009. Detective Frazer testified that, in addition to finding blood on the bicycle, in the garage, and in other areas of the house, he found blood on a grinding wheel located in the garage. The blood drops on the grinding wheel provided the basis for charging defendant with tampering with physical evidence. Before trial, defendant unsuccessfully moved to

6

suppress all evidence obtained from the two searches of his home.[1]

Thomas Butler, a Valley Hospital emergency room nurse, testified he recorded that defendant was admitted with an injury to his right hand; he made this entry on July 4, 2009, at 9:14 p.m. Defendant told Butler he received the injury because "he was intoxicated and had an accident while sharpening a lawn mower blade."

On October 11, 2009, more than three months after the stabbing of J.I., defendant was a passenger in a vehicle operated by a friend, when the vehicle was stopped by a Waldwick police officer, based upon a suspicion of drunken driving. The stop occurred in front of defendant's home and the police allowed him to exit the vehicle, while they conducted a field sobriety test on the driver. One of the police officers present wore a sound-recording device during the stop, while a camera, mounted in a patrol car, video-recorded portions of the stop.

The audio recorder and video camera recorded a loud, profanity-laced rant of defendant, who appeared intoxicated. He

---

[1] Judge Harry Carroll denied defendant's motion after determining the warrantless search of defendant's home was justified under the emergency-aid exception to the warrant requirement. Judge Carroll only decided the suppression motion; he was not the trial judge.

referred to one officer as a "fucking homo" and another as "fat." He also accused the police of breaking his DVD player and laptop computer, and stealing his "adult DVDs," during the search of his home three months earlier, following the stabbing of J.I. As a result of his aggressive demeanor, the police threatened to arrest him for disorderly conduct. During the encounter, defendant appeared to reference the stabbing of J.I., when he yelled:

> Well, you know what[?] I did nothing in this town except beautify the whole thing and rebuilt half of it and these mother fuckers [inaudible] and start telling me I fucking eviscerated some little Spick[.] [W]ho gives a fuck about some little Spick[?] [A]nd I didn't do it anyway, I wasn't even there[,] so fuck you! Stupid Pigs.

At trial, the State presented the recordings of defendant's intoxicated rant as evidence of his "hatred and prejudice against Hispanic immigrants" and as proof of his motive for attacking J.I.

Defense counsel objected, stating the "video is highly prejudicial. It shows my client screaming and ranting and raving and making other statements" not related to Hispanic persons. The judge overruled the objection and admitted the bulk of the disputed evidence, ordering only limited redactions in response to defense counsel's concerns. Specifically, the

8

judge required redaction of the recordings to eliminate defendant's references to homosexuality, obesity, and prior drunk-driving episodes. The judge refused to redact the recording further, reasoning that the "demeanor . . . exhibited by the defendant on the tape . . . is what it is and I don't feel that any prejudice that the jury may have towards somebody flipping out over maybe nothing outweighs the probative value"; the recordings were redacted in accordance with the judge's ruling.[2] The judge also ruled the jury must receive appropriate limiting instructions when the evidence was presented, and as part of the jury charge, be instructed on the restricted use they could make of the evidence under N.J.R.E. 404(b).

Officer Jody Zuzeck testified concerning the October 11, 2009 encounter and the recordings that were made at that time. The redacted recordings were then played for the jurors, who were provided with a corresponding transcript. On cross-examination, Officer Zuzeck was asked whether someone on the recording had talked "about a gun being pointed at you"; she replied that defendant "had gone in the house and I believe

---

[2] This video, as redacted, along with testimony of J.M., an acquaintance of defendant, described later, was the only evidence concerning defendant's alleged anti-Hispanic motive for attacking J.I.

9

Officer Greco was indicating to me to take cover because he is known to have weapons."

Immediately thereafter, the judge issued a limiting instruction concerning the recording and testimonial evidence. The judge noted that the evidence involving defendant's anti-Hispanic comment was admitted to establish defendant's "alleged motive in attacking [J.I.]," and that

> you may not use this evidence to decide that [defendant] has a tendency to commit crimes or simply that he is a bad person. That is[,] you may not decide that just because he has committed wrongs or acts he is more likely to be guilty of the present offense.
>
> I have admitted the evidence only to help you decide the specific question of motive. You may not consider it for any other purpose and may not find that [defendant] is guilty simply because the [S]tate had offered evidence that he may have committed such wrongs or acts.

While the limiting instruction expressly addressed the use that the jury could make of defendant's anti-Hispanic comment on the recording, it did not address the use that the jury could make of any of the other matters contained on the remainder of the recordings.

As further proof of defendant's alleged anti-Hispanic motive for stabbing J.I., the State presented the testimony of J.M., an acquaintance of defendant, concerning derogatory verbal references that defendant made about Hispanic persons in the

10

past. J.M. testified that he met defendant intermittently over an eleven-year period at Alcoholics Anonymous meetings and that, following the meetings, the participants would go out and socialize over a meal. At such gatherings, J.M. heard defendant refer to Hispanic persons as "[s]pics or wetbacks" and state that "spics are going to take over the country, illegal immigration, [a]nd because they have big families that they would take over the country, [a]nd that the white man was in jeopardy."

J.M. also testified that he employed defendant to do carpentry work for him occasionally and that, when defendant noticed a four-man Peruvian crew working at J.M.'s construction site, defendant

> expressed to me that I was part of the cause of precipitating the ills of the country, where we're going wrong, that I was hiring illegal immigrants to provide these services, [a]nd [defendant] also expressed that in his neighborhood that Spanish people, or Latinos, or spics were moving into his neighborhood [a]nd he felt jeopardized by that.

At no point did J.M. identify an exact time or place when defendant made those comments.

On cross-examination, J.M. testified that defendant had filed a lawsuit against him for unpaid bills for services rendered and that the matter had been resolved through

11

arbitration, about seven years earlier. He testified that he was initially angry with defendant for suing him, but that the anger passed.

Defendant elected to testify at trial; his version of events occurring at "The Rock" differed markedly from that of J.I. Defendant claimed he offered to share a drink with J.I., who then drew a knife and ordered, in Spanish, that defendant give him money. Fearing for his safety, defendant reached out to grab the knife and J.I. lunged at him with the knife, causing a wound on defendant's right hand. The two men struggled over the knife and then fell to the ground, still fighting. Before they fell, defendant stabbed J.I. with the knife "more than once in the chest area." After they fell to the ground, defendant subdued J.I. and the fight ended. Defendant testified that, following the stabbing, he "got up and was kind of freaking out." He then jumped on his bicycle and rode home.

Defendant testified he fled the scene and did not call the police because he thought he "wouldn't get a fair shake from the police[,]" because of his prior criminal record (a 1992 second-degree conviction). Defendant also admitted he did not tell the truth at the hospital when he said he had injured his hand while sharpening a lawnmower blade. Defendant explained he was concerned that, if he told the nurse he was involved in a knife

12

fight, the hospital would notify the police, and he "didn't want police involvement because [he] thought they wouldn't believe [him] at all."

On July 18, 2011, the jury returned its verdict, finding defendant not guilty of attempted murder, under count one, but guilty of second- and third-degree aggravated assault, unlawful possession of a weapon, evidence tampering, and hindering apprehension, under the remaining counts. After merger, the judge sentenced defendant on the second-degree aggravated-assault conviction to the maximum term of ten years of imprisonment, subject to an eighty-five percent parole disqualifier under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On the tampering-with-evidence conviction, the judge sentenced defendant to an eighteen-month term of imprisonment, and on the conviction of hindering apprehension, defendant received a five-year term of imprisonment, both terms consecutive to the sentence for aggravated assault.

On April 17, 2012, defendant pled guilty to the severed weapon-possession charges, pursuant to a plea agreement, and received a sentence of five years of imprisonment, to run concurrently with the prison terms imposed on October 7, 2011. As part of his plea agreement, defendant reserved the right to

13

appeal the denial of his suppression motion as well as the court's denial of certain jail credits.

II.

On the appeal of his conviction for the weapon-possession charges, defendant raises the following issues:

> POINT I:  THE WARRANTLESS SEARCH OF THE SHEPPARD HOME WAS IN VIOLATION OF DEFENDANT'S CONSTITUTIONAL RIGHTS AND THE TRIAL COURT ERRED IN FAILING TO SUPPRESS ALL FRUITS OF THAT SEARCH AND FURTHER ERRED IN DENYING THE MOTION TO REOPEN THE HEARING.

> POINT II:  THE SENTENCING COURT ERRED BY DENYING [DEFENDANT'S] 378 DAYS OF JAIL CREDIT TO WHICH HE WAS ENTITLED BASED ON THE TIME SERVED PRIOR TO SENTENCING ON THE OTHER COUNTS OF THE INDICTMENT.

Regarding defendant's second point, the State now agrees that defendant should have received 378 days of jail credit, pursuant to State v. Hernandez, 208 N.J. 24 (2011).  We therefore remand to the Law Division for the entry of an amended judgment of conviction reflecting these additional jail credits.

Addressing defendant's first point, which challenges the court's denial of his suppression motion, we are not persuaded by defendant's arguments.  In reviewing a decision on a suppression motion, we must defer to the judge's factual findings, so long as they are supported by sufficient credible evidence, and we owe special deference to the judge's

14

credibility determinations.  State v. Diaz-Bridges, 208 N.J. 544, 565 (2011); State v. Elders, 192 N.J. 224, 243-44 (2007).

At the hearing on the suppression motion, Judge Carroll heard the testimony of Detective Frazer, who stated he decided to enter defendant's house without a warrant to search for any injured or incapacitated persons.  Detective Frazer and the police entered the house at about 11:30 p.m. and searched the premises, exiting at 11:47 p.m.  While they did not find any injured persons, they did observe a handgun and knives, which led Detective Frazer to seek a search warrant.  Detective Frazer did not receive information that defendant had been admitted to a nearby hospital, several hours earlier, until about 12:15 a.m., on July 5, 2009.

Following the hearing, Judge Carroll issued a written decision denying defendant's suppression motion, concluding the warrantless search was justified under the "emergency aid doctrine exception" to the constitutional warrant requirement. "The emergency aid doctrine is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, firefighters, or paramedics, to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious

15

injury." State v. Frankel, 179 N.J. 586, 598, cert. denied, 543 U.S. 876, 125 S. Ct. 108, 160 L. Ed. 2d 128 (2004).

At the time that Judge Carroll decided defendant's suppression motion, New Jersey courts employed a

> three-prong test to determine whether a warrantless search by a public safety official is justified under the emergency aid doctrine. Under that test, the public safety official must have an objectively reasonable basis to believe that an emergency requires that he [or she] provide immediate assistance to protect or preserve life, or prevent serious injury; his [or her] primary motivation for entry into the home must be to render assistance, not to find and seize evidence; and there must be a reasonable nexus between the emergency and the area or places to be searched.
>
> [Id. at 600 (footnote omitted) (internal citations omitted).]

Subsequently, in State v. Edmonds, 211 N.J. 117, 132 (2012), the New Jersey Supreme Court eliminated the second part of the test (the "subjective-motivation factor"), in order to "align our jurisprudence with federal law."

Applying the three-part Frankel test, Judge Carroll determined that the blood trail, the amount of blood observed, the neighbor's report of defendant's return to his house with a bleeding hand wound, the lack of response to door-knocking and telephone calls, and the lack of information from nearby hospitals, gave Detective Frazer an "objectively reasonable

16

basis . . . to believe that immediate assistance was necessary[,]" thus satisfying the first part of the test. According to the judge, the second part was satisfied by Detective Frazer's testimony that his motivation to conduct the warrantless search was the large quantity of spilled blood, which suggested that an injured person could be in the house. Last, the judge determined that the limited nature of the seventeen-minute police search of the house led him to conclude that there was a reasonable nexus between the indicated emergency and the scope of the search, thus meeting the third part of the test.

We reject defendant's argument that the warrantless search was improper because the police waited almost two hours before entering the house, thus negating the "emergency" basis for the warrant exception. As Judge Carroll noted the police delayed entering the house because they were

> contacting local hospitals to ascertain whether the defendant had been admitted . . . [G]iven the fluid and on-going nature of the investigation up to that point, the [c]ourt does not consider the lapse in time in developing that information to be fatal to the [police's] determination to enter the home to seek out any person who might be in need of assistance.

Also, more time was required in order for Detective Frazer to assemble police officers to conduct the search and to have

17

the officers "suited up with their tactical gear," such as bullet-resistant vests, helmets, and shields. Such gear was deemed necessary because of the nature of the underlying offense, a knifing.

Accordingly, we conclude the purported delay by police in entering the house pursuant to the emergency aid doctrine was explained by the difficulty in obtaining hospital information and by the mechanics of the search itself. Defendant is thus incorrect when he argues that there was no ongoing "emergency" to support the warrantless entry and search. We affirm the denial of defendant's suppression, and thus his conviction on the weapon-possession charges, substantially for the reasons set forth in Judge Carroll's cogent written opinion.

### III.

On the appeal of his conviction for second-degree aggravated assault and related charges, defendant raises the following issues:

> POINT I: THE TRIAL COURT ERRED IN FAILING TO SUPPRESS HIGHLY PREJUDICIAL EVIDENCE OF AN UNRELATED POLICE ENCOUNTER WHICH OCCURRED THREE MONTHS AFTER THE JULY 4TH INCIDENT.
>
> POINT II: THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED BY FAILING TO PROPERLY SANITIZE THE RULE 404(B) OTHER ACTS EVIDENCE AND BY FAILING TO GIVE AN APPROPRIATE LIMITING INSTRUCTION REGARDING THE EVIDENCE OF THE OCTOBER 11, 2009[,] TRAFFIC STOP.

18

A. FAILURE TO APPROPRIATELY SANITIZE THE RULE 404(B) OTHER ACTS EVIDENCE REGARDING THE UNRELATED OCTOBER 11, 2009 TRAFFIC STOP.

B. FAILURE TO GIVE A PROPER LIMITING INSTRUCTION TO THE JURY ON HOW THE JURY WAS TO USE THE EVIDENCE OF [DEFENDANT'S] DEMEANOR.

POINT III: THE TRIAL COURT ERRED IN ADMITTING THE TRIAL TESTIMONY OF [J.M.] REGARDING [DEFENDANT'S] USE OF DEROGATORY TERMS FOR HISPANICS IN ORDER TO PROVE MOTIVE FOR THE CRIMES CHARGED.

POINT IV: THE TRIAL COURT ERRED BY RULING WITHOUT ADEQUATE BASIS THAT DETECTIVE FRAZER COULD REMAIN IN THE COURTROOM AND OBSERVE THE TESTIMONY OF EVERY OTHER STATE WITNESS PRIOR TO HIS OWN TESTIMONY.

POINT V. THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION TO COMPEL THE STATE TO DISCLOSE CRIMINAL CASE HISTORIES OF THE STATE'S WITNESSES.

POINT VI: THE WARRANTLESS SEARCH OF DEFENDANT'S HOME WAS IN VIOLATION OF DEFENDANT'S CONSTITUTIONAL RIGHTS AND THE TRIAL COURT ERRED IN FAILING TO SUPPRESS ALL FRUITS OF THAT SEARCH.

POINT VII: THE TRIAL COURT ERRED BY FAILING TO DISMISS THE INDICTMENT WHERE DETECTIVE FRAZER TAINTED THE PROCEEDINGS WITH UNQUALIFIED MEDICAL EXPERT TESTIMONY AND IMPROPER COMMENT ON [DEFENDANT'S] INVOCATION OF HIS RIGHT TO REMAIN SILENT.

POINT VIII: THE TRIAL COURT ERRED BY ADMITTING THE BELT BUCKLE KNIFE INTO EVIDENCE AND ALLOWING THE STATE'S REBUTTAL

19

WITNESS, [L.F.], TO PROVIDE IRRELEVANT, PREJUDICIAL TESTIMONY.

POINT IX: THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON SELF-DEFENSE WHEN THE JURY ASKED FOR DEFINITION OF POSSESSION REGARDING THE CHARGE OF POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE.

After careful review, we conclude the trial court mistakenly exercised its discretion when it admitted the bulk of the evidence concerning the defendant's encounter with police three months after the stabbing, without appropriate "sanitization" or jury instructions. Similar error occurred relating to the testimony of J.M. Concluding the errors were clearly capable of producing an unjust result, R. 2:10-2, we reverse defendant's conviction for aggravated assault, and related charges, and remand for a new trial.

Because evidence of a defendant's bad conduct on another occasion "has a 'unique tendency' to prejudice a jury against the defendant, it must be admitted cautiously." State v. Gillispie, 208 N.J. 59, 85 (2011) (quoting State v. Reddish, 181 N.J. 553, 608 (2004)). "The underlying danger of admitting other-crime evidence is that the jury may convict the defendant because he [or she] is 'a "bad" person in general.'" State v. Cofield, 127 N.J. 328, 336 (1992) (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)). Evidence Rule 404(b) serves to avoid that consequence.

20

The rule prohibits admission of such evidence to "prove the disposition of a person in order to show that such person acted in conformity" with that disposition, but it permits use of such evidence for other limited purposes — including to establish motive or intent when "relevant to a material issue in dispute." N.J.R.E. 404(b). The dispute must be genuine. State v. Darby, 174 N.J. 509, 518 (2002). Thus, "other-crimes evidence should not be admitted solely to bolster the credibility of a witness against a defendant." State v. P.S., 202 N.J. 232, 256 (2010).

In Cofield, the Court developed "a rule of general application in order to avoid the over-use of extrinsic evidence of other crimes or wrongs[.]" Cofield, supra, 127 N.J. at 338. That rule sets forth in four prongs the necessary conditions for admission of bad-act evidence:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid.]

With respect to the first prong, prior to Cofield the Court stated that when defendant's motive or intent "is important and

21

material, a somewhat wider range of evidence is permitted in showing such motive or intent than is allowed in the support of other issues." State v. Rogers, 19 N.J. 218, 228 (1953). The Court reasoned that "[o]therwise there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist." Ibid. On that ground, the Court stated a broad rule applicable to show state of mind:

> All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his [or her] actions are admissible in evidence against him [or her] although they may have occurred previous to the commission of the offense.
>
> [Ibid.]

Cofield limited the breadth of that standard by permitting the use of 404(b) evidence in a case where there is a genuine dispute about motive or intent. Cofield made it clear that the State's need for the evidence is a factor important to relevance under prong one. Cofield, supra, 127 N.J. at 338-39 (noting that "if identity is not really in issue . . . it would be improper to justify the use of other-crime evidence on that basis").

22

<u>A. Evidence from October 2011 encounter.</u>

On appeal, defendant argues the trial court erred by failing to suppress, appropriately sanitize, or properly instruct the jury on the evidence concerning the October 2009 encounter. During the encounter, defendant revealed himself as a loud, aggressive, and foul-mouthed drunk, who made a single anti-Hispanic comment referencing J.I.

The trial judge explicitly based the admission of the encounter evidence on <u>N.J.R.E.</u> 803(b)(1). "<u>N.J.R.E.</u> 803(b)(1), an exception to the hearsay rule, provides that a statement can be admitted into evidence if the statement is offered against a party which is 'the party's own statement, made either in an individual or in a representative capacity.'" <u>State v. Beckler</u>, 366 <u>N.J. Super.</u> 16, 26 (App. Div.), <u>certif. denied</u>, 180 <u>N.J.</u> 151 (2004).

"Generally, as long as there are no <u>Bruton</u>,[3] <u>Miranda</u>,[4] privilege or voluntariness problems, and subject to <u>N.J.R.E.</u> 104(c), the State may introduce at a criminal trial any relevant statement made by a defendant[,]" so long as the statement's probative value is not substantially outweighed by its

---

[3] <u>Bruton v. United States</u>, 391 <u>U.S.</u> 123, 88 <u>S. Ct.</u> 1620, 20 <u>L. Ed.</u> 2d 476 (1968).

[4] <u>Miranda v. Arizona</u>, 384 <u>U.S.</u> 436, 86 <u>S. Ct.</u> 1603, 16 <u>L. Ed.</u> 2d 694 (1966).

23

prejudicial effect on the defendant under N.J.R.E. 403(a). State v. Covell, 157 N.J. 554, 572, 575 (1999). "'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. "The true test [for relevance] is the logical connection between the proffered evidence and a fact in issue, i.e., whether the thing sought to be established is more logical with the evidence than without it." State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990).

Even though it was made more than three months after the stabbing, defendant's single anti-Hispanic comment during the encounter was plainly relevant both to show defendant's anti-Hispanic motive for stabbing J.I. and to counter defendant's asserted claim of self-defense. In his comment, defendant referred to J.I. as "some little Spick" and denied stabbing him, claiming to have been somewhere else. Defendant's comment was relevant because its admission into evidence made it more logical to conclude both that defendant had an anti-Hispanic motive for stabbing J.I. and that his subsequent claim of self-defense was suspect.

Indeed, the State's declared purpose in presenting the evidence of the October 2009 encounter was to show defendant's anti-Hispanic motive for attacking J.I. However, applying

24

Hutchins, the question concerning relevance was whether remaining material on the recording made it "more logical" than not that defendant had an anti-Hispanic motive when he stabbed J.I. See ibid. Analysis of the balance of the evidence from the October 2009 encounter fails to show a "logical connection" between the remaining material and J.I.'s stabbing to make the material relevant to show defendant's motive. See ibid. Accordingly, none of the other statements made by defendant, nor the statements made by police, should have been presented to the jury. In order to show defendant's alleged motive, the jury could have been apprised of his single anti-Hispanic comment without any reference to his drunk and disorderly conduct, his accusations of police vandalism and theft, his adult videos, or his possession of firearms and willingness to use them against police.

Under N.J.R.E. 403(a), evidence is not admissible under N.J.R.E. 803(b)(1) if its probative value is substantially outweighed by the risk of undue prejudice or confusion of the issues. Covell, supra, 157 N.J. at 571-75. Defendant's single anti-Hispanic comment on the recording is more probative than prejudicial because his voluntary statement explicitly dealt with J.I. and the stabbing and indicated a motive for the stabbing; however, we conclude the balance of the evidence from

25

the October 2009 encounter lacked any significant probative value and had a clear capacity to unduly prejudice defendant and to confuse the jury. Accordingly, the remaining material on the recording should have been excluded under <u>N.J.R.E.</u> 403(a). Defendant suffered a manifest denial of justice when the trial court mistakenly exercised its discretion by not excluding it.

The critical error occurred when the trial court failed to apply <u>N.J.R.E.</u> 404(b) in addressing the encounter evidence. On June 8, 2011, approximately two weeks before the start of defendant's trial, the Supreme Court issued its decision in <u>State v. Rose</u>, 206 <u>N.J.</u> 141 (2011), stating that

> [i]n readdressing the other bad acts categories of res gestae evidence, we use this opportunity to direct trial courts to make the <u>Rules of Evidence</u> the touchstone for the analysis of all such evidence. Whenever the admissibility of uncharged bad act evidence is implicated, a <u>Rule</u> 404(b) analysis must be undertaken. The threshold determination under <u>Rule</u> 404(b) is whether the evidence relates to "other crimes," and thus is subject to continued analysis under <u>Rule</u> 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly <u>Rule</u> 403.
>
> Although <u>Rule</u> 404(b) is often described as one of exclusion, it focuses on a distinct, worrisome category of evidence that, if presented, is only admissible for limited purposes, and the jury must be informed both as to how the evidence may, and may not, be used. The <u>Rule</u> provides an

26

> analytical framework through which all potential "other crimes, wrongs, or acts" evidence should be sifted. Hence Rule 404(b) shall be the default starting point for analysis of uncharged bad acts that in the past has been also known as res gestae.
>
> [Rose, supra, 206 N.J. at 179-80.]

Restated, the Rose Court noted that, from that point in time going forward, evidence involving other bad acts not charged in a current prosecution, but sought to be admitted in that prosecution, must be considered under N.J.R.E. 404(b). Id. at 182. Accordingly, because other uncharged bad acts (defendant's anti-Hispanic comment, his drunken disorderly conduct, etc.) were part of the encounter evidence, the Rose holding applied to defendant's case. Although the record includes discussion of the Rose decision, the trial court failed to apply N.J.R.E. 404(b) when considering whether to admit the encounter evidence.

N.J.R.E. 404(b) governs the admissibility of evidence involving other crimes, wrongs, or acts, stating that such evidence is inadmissible

> to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

27

According to Rose, the "threshold determination" under N.J.R.E. 404(b) is whether the other-crime/bad-act evidence is actually evidence concerning other crimes or bad acts or whether it is evidence intrinsic to the charged crime. Rose, supra, 206 N.J. at 179. If it is intrinsic evidence, then N.J.R.E. 404(b) does not apply because the evidence does not involve some other crime, but instead pertains to the charged crime. Ibid.

The Rose Court referred to the Third Circuit's decision in United States v. Green, 617 F.3d 233 (3rd Cir.), cert. denied, 562 U.S. ___, 131 S. Ct. 363, 178 L. Ed. 2d 234 (2010), as a "workable, narrow description of what makes uncharged acts intrinsic evidence of the charged crime, and therefore not subject to Rule 404(b)." Rose, supra, 206 N.J. at 180. The Court agreed with the reasoning in Green, stating:

> "we . . . reserve the 'intrinsic' label for two narrow categories of evidence. First, evidence is intrinsic if it 'directly proves' the charged offense. This gives effect to Rule 404(b)'s applicability only to evidence of 'other crimes, wrongs, or acts.' If uncharged misconduct directly proves the charged offense, it is not evidence of some 'other' crime. Second, 'uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.' But all else must be analyzed under Rule 404(b)."
>
> [Rose, supra, 206 N.J. at 180 (quoting Green, supra, 617 F.3d at 248-49 (internal citations omitted)).]

28

Here, the October 2011 encounter occurred three months after the stabbing, so the encounter evidence does not fall into the second category of intrinsic evidence consisting of uncharged acts performed contemporaneously with the charged crime. However, defendant's anti-Hispanic comment falls into the first category of intrinsic evidence that directly proves the charged crime, as it presents a possible motive for the stabbing.

Also falling into the first category of intrinsic evidence that directly proves the charged crime was defendant's comment denying he stabbed J.I. and denying he was at the stabbing scene. Those denials are seriously undermined by and at odds with his later claim of self-defense, thus, tending to prove the charged offense. Accordingly, under the rationale in Rose, the part of the encounter evidence involving defendant's anti-Hispanic comment represents intrinsic evidence to which N.J.R.E. 404(b)'s exclusion does not apply.

In contrast, defendant's remaining words and conduct from the October 2009 encounter provide little, if any, probative evidence of the charged stabbing offense. Consequently, under Rose, the non-intrinsic evidence showing defendant's loud and drunken disorderly conduct, his accusations of police theft and vandalism, his possession of adult videos, and the police

29

recognition of his potential use of weapons against them should have been "sifted" through the "analytical framework" of N.J.R.E. 404(b) to determine its admissibility. Rose, supra, 206 N.J. at 180. No such analysis occurred.

Applying Cofield's four-prong test to the material that is unrelated to the anti-Hispanic comment appearing on the recording, it is plain that the balance of the material fails to satisfy the test's first prong. As we noted in discussing N.J.R.E. 803(b)(1), the remaining material on the recording had nothing to do with motive.

The second prong of the Cofield test addresses the similarity and temporality of the disputed evidence; it is not "universally required" that it be applied in all cases. Rose, supra, 206 N.J. at 163. The remaining material on the recording does not involve any similar anti-Hispanic verbiage or references to stabbings, and the encounter occurred more than three months after the stabbing. The remaining material on the recording does not satisfy the second prong of Cofield.

The third prong of the Cofield test requires the remaining material evidence be clear and convincing. Defendant's vociferous statements on the recording clearly satisfied this prong.

30

"The fourth prong of the Cofield test is typically considered the most difficult to overcome." Rose, supra, 206 N.J. at 160. This is so because, unlike N.J.R.E. 403, which provides that relevant evidence is admissible unless its probative value is substantially outweighed by the risk of undue prejudice, the fourth prong only requires that the "probative value of the evidence must not be outweighed by its apparent prejudice." Rose, supra, 206 N.J. at 160-61. Also, "'[i]f other less prejudicial evidence may be presented to establish the same issue, the balance in the weighing process [under the fourth prong] will tip in favor of exclusion.'" Id. at 161 (quoting State v. Barden, 195 N.J. 375, 392 (2008)).

As noted, the remaining material on the recording had no probative value or relevance to show defendant's alleged anti-Hispanic motive in stabbing J.I. Balanced against that minimal probative value and questionable relevance to the other issues in the case is the very real prejudice to defendant when the jury viewed and heard the remaining material depicting him as a drunken and disorderly person who might shoot police officers, while he complained about stolen and damaged personal property, including his adult videos.

Moreover, it was unnecessary to present the prejudicial and irrelevant remainder material in order to show defendant's

31

alleged anti-Hispanic motive. Instead, such proof of motive was readily available in "other less prejudicial" but plainly relevant evidence. Barden, supra, 195 N.J. at 392. That evidence was defendant's single anti-Hispanic comment, which could have been presented to the jury without the remaining material.

"[I]n order to minimize 'the inherent prejudice in the admission of other-crimes evidence, our courts require the trial court to sanitize the evidence when appropriate.'" Rose, supra, 206 N.J. at 161 (quoting Barden, supra, 195 N.J. at 390). "[W]here the other-crimes evidence is otherwise admissible but involves inflammatory and other unduly prejudicial facts, the judge is obliged to require the evidence to be sanitized to the extent necessary to accommodate both the State's right to establish a fact in issue and the defendant's right to a fair trial." State v. Collier, 316 N.J. Super. 181, 185 (App. Div. 1998), aff'd o.b., 162 N.J. 27 (1999).

Thus, when admitting N.J.R.E. 404(b) evidence, the trial court is obliged to "limit the scope of that evidence to those facts necessary to prove the proposition for which it is offered." Ibid. That is, the other-crime/bad-acts evidence must be sanitized so that only those facts are admitted that are reasonably necessary to advance the probative purpose for which

32

the evidence is proffered. State v. Fortin, 318 N.J. Super. 577, 598 (App. Div. 1999), aff'd, 162 N.J. 517 (2000). Where unnecessary and prejudicial facts are presented that do not advance that probative purpose, the fourth prong of the Cofield test may be deemed to have been violated. Gillispie, 208 N.J. at 89-92.

Here, the trial court declined defendant's repeated requests to effectively sanitize the October 2011 encounter evidence by admitting only the evidence involving defendant's anti-Hispanic comment. In doing so, the court failed to sanitize the encounter evidence so as to limit it to those facts necessary to show defendant's alleged anti-Hispanic motive for stabbing J.I., which was the State's declared purpose for seeking to admit the encounter evidence in the first place.

As a result, the fourth prong of the Cofield test was not satisfied because the clear prejudice to defendant from admitting the remaining comments and conduct depicted in the video-recording plainly outweighed any probative value of that evidence in showing defendant's alleged anti-Hispanic motive. In sum, because this evidence failed to satisfy three of the four prongs of the Cofield test, that evidence should have been excluded by the trial court.

33

The trial court's error in admitting this evidence was compounded by the failure to provide proper limiting instructions to the jury. The <u>Rose</u> Court recognized that

> limiting instructions must be provided to inform the jury of the purposes for which it may, and for which it may not, consider the evidence of defendant's uncharged misconduct, both when the evidence is first presented and again as part of the final jury charge. A suitable limiting instruction "explain[s] precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere."
>
> [<u>Rose</u>, <u>supra</u>, 206 <u>N.J.</u> at 161 (quoting <u>Barden</u>, <u>supra</u>, 195 <u>N.J.</u> at 390 (citation and internal quotation marks omitted)).

Here, the trial court issued limiting instructions, both when the video-recording was played, and as part of the jury instructions. The instructions cautioned the jurors that the encounter evidence, all of it, was "introduced only for a specific narrow purpose;" that is, "it is offered by the [S]tate to establish [defendant's] alleged motive in attacking [J.I.]" The problem with this instruction is that the only part of the encounter evidence that patently involved defendant's possible motive for stabbing J.I. was defendant's anti-Hispanic comment that was directed at J.I.

34

Thus, the jury was not specifically instructed to disregard the police threat to arrest defendant for drunken and disorderly conduct, defendant's accusation of police theft and vandalism, and his possession of adult videos against him as evidence that he is a "bad" person who was likely to have committed the crimes charged. While the jury was instructed to disregard Officer's Zuzeck's testimony that defendant was known to have weapons, it was not specifically instructed on the use that it could make of another officer's statement that Officer Zuzeck should take cover so as to preclude defendant from having a clear shot at her. Defendant may have been prejudiced by the jury's unguided use of such evidence, which revealed a concern by police for their safety. Because the limiting instructions failed to address the bulk of the material put before the jury of the October 2011 encounter, they exacerbated the harm that resulted.

In conclusion, the trial court erred when it addressed the encounter evidence pursuant to N.J.R.E. 803(b)(1). While the evidence involving defendant's anti-Hispanic comment was otherwise admissible, the trial court should have applied the analytical framework of N.J.R.E. 404(b) to the remaining encounter evidence, as required by Rose. Because the trial court did not follow the Rose rationale when it admitted the

35

encounter evidence, it made a clear error of judgment and abused its discretion in doing so.

We further conclude the evidence against defendant debunking his claim of self-defense was not so overwhelming that the erroneous admission of the encounter evidence may be deemed harmless and his convictions therefore affirmed. Gillispie, supra, 208 N.J. at 93-94 (other-bad-acts evidence erroneously admitted, but reversal not required because of overwhelming and undeniable evidence of guilt).

There is limited evidence concerning the exact details of the stabbing and as a result, the jury may have been misled by the 2009 encounter evidence to conclude defendant's drunken behavior three months after the stabbing mirrored his behavior on the day of the stabbing. Specifically, defendant testified he injured his hand during the fight with J.I. and his medical expert opined the wound was a "classic defensive injury" usually suffered by a person defending against a knife attack. The State presented testimony from a treating surgeon who described defendant's wound as a "classic knife wound," but who did not opine whether the wound had been incurred defensively or offensively. Additionally, the only evidence concerning defendant's alleged anti-Hispanic motive for attacking J.I. came from the encounter evidence and the testimony of J.M. According

36

to J.I., his assailant only yelled twice for him to "shut the fuck up" prior to the attack; the assailant did not utter any anti-Hispanic epithets. Therefore, against this limited evidential record, we conclude erroneously admitting the unsanitized encounter evidence may have improperly contributed to defendant's convictions. Accordingly, we do not view the trial court's error as harmless.

B. Testimony of J.M.

Defendant further argues the trial court erred in admitting testimony from J.M. Prior to trial, the State moved to present evidence of defendant's alleged anti-Hispanic motive for stabbing J.I. from J.M., who stated defendant had made derogatory verbal references about Hispanic persons in the past and expressed anti-Hispanic and anti-immigrant opinions. The court granted the State's motion under the other-crimes/bad-acts analytical framework of N.J.R.E. 404(b) and applied the four-prong Cofield test for admissibility. The court reasoned that such evidence was relevant to prove defendant's motive for stabbing J.I., that J.M.'s testimony constituted clear and convincing evidence of that motive, and that the probative value of the evidence clearly outweighed any prejudice defendant would suffer as a result of admitting the evidence. Cofield, supra, 127 N.J. at 338.

37

The record does not indicate the trial court issued a limiting instruction either before or immediately after J.M.'s testimony, instructing the jury on the use it could make of that testimony. On the following day, the court issued an instruction involving J.M., but it did not address the permitted use of his testimony. Eighteen days after J.M. testified, the jury viewed and heard the recordings of the October 2011 encounter and received the testimony of Officer Zuzeck. At that point, the trial court issued a limiting instruction addressing the restricted use that the jury could make of J.M.'s testimony, Zuzeck's testimony, and the video-recording.

Subsequently, defendant testified and admitted that he used the word "spic" in referring to Hispanic persons, explaining that "construction people speak that way." He also explained that his concern about the "growing Hispanic and illegal immigration population in [his] neighborhood" was that landlords had improperly rented single family dwellings to "20 or 30 people," which had negatively affected property values. He denied ever stating that "Hispanics are pushing the white man out of the country."

In admitting J.M.'s testimony, the court correctly treated defendant's comments to J.M. as bad-act evidence governed by N.J.R.E. 404(b), but incorrectly applied Cofield's four-prong

38

test in determining its admissibility. Under the first prong of that test, addressing relevancy, the court correctly found J.M.'s testimony relevant because defendant's statements plainly showed an anti-Hispanic animus on his part, thus suggesting a possible motive for J.I.'s stabbing. The court made no explicit finding under the second prong of the test, however, which required that J.M.'s bad-conduct evidence had to be similar in kind and reasonably close in time to the stabbing. Cofield, supra, 127 N.J. at 338. While this second prong is not "universally required" in all cases, Rose, supra, 206 N.J. at 163, if it had been addressed, it would have weighed against admitting J.M.'s testimony, because the record does not indicate when defendant allegedly made his comments to J.M. If the two men stopped talking to one another after defendant's lawsuit against J.M. was arbitrated seven years before trial, J.M.'s testimony could involve comments made by defendant at least five years before the stabbing, and possibly much longer. The State failed to elicit from J.M. any approximate date when the anti-Hispanic comments were allegedly made. Accordingly, the timing of those comments remained a matter of speculation, and J.M.'s testimony did not satisfy the second Cofield prong.

The court appears to have determined that J.M.'s proposed testimony satisfied the third prong of the Cofield test, which

39

requires that "the evidence of the other crime must be clear and convincing." Cofield, supra, 127 N.J. at 338. The court did so by mistakenly leaving it to the jury to "decide whether or not the statements were made . . . to [J.M.] by the defendant." When J.M. testified, it was revealed on cross-examination that he had been sued by defendant in the past. On its face, that conflict raises a question as to why he was offering his testimony against defendant at trial. When this past litigation is combined with the uncertain timing of defendant's alleged comments to J.M. and with defendant's denial that he made these comments, we fail to see support for a finding that J.M.'s testimony constituted clear and convincing evidence.

Unlike the video-recording, which set out irrefutable evidence of what defendant said, J.M.'s testimony involved hearsay that was allowed to be conveyed to the jury by a person who had been sued by defendant. Consequently, the record does not support a finding that the third prong of the Cofield test was satisfied.

Under the fourth prong of the Cofield test, the "probative value of the [other-crime/bad-act] evidence must not be outweighed by its apparent prejudice." Ibid. As pointed out by the Rose Court, "[t]hat standard is more exacting than Rule 403, which provides that relevant evidence is admissible unless its

40

probative value is <u>substantially</u> outweighed by the risk of undue prejudice." <u>Rose</u>, <u>supra</u>, 206 <u>N.J.</u> at 161. That is, under the <u>Cofield</u> test's fourth prong, the court is only called upon to determine if the apparent prejudice that would result from admitting the disputed evidence merely outweighs, not substantially outweighs, the probative value of the evidence.

Here, the court did not apply the proper standard under the fourth prong. Instead, the judge reasoned that the disputed evidence would be admitted unless its probative value "clearly is outweighed by the prejudice to the defendant." Thus, the judge would not exclude J.M.'s testimony unless he found "the prejudice clearly outweighs the motivational evidence or motive evidence." While the term "clearly outweighs" is not the same as the term "substantially outweighs" set out in <u>N.J.R.E.</u> 403, it is also not the same as the term "outweighs" that is set out in <u>Cofield</u>'s fourth prong. In short, the court did not apply the correct standard when it made its admissibility determination under the fourth prong.[5]

---

[5] We note that defendant's anti-Hispanic statements to J.M. do not qualify as intrinsic evidence because they did not "directly" prove the crime charged or "'facilitate the commission of the charged crime.'" <u>Rose</u>, <u>supra</u>, 206 <u>N.J.</u> at 180 (quoting <u>Green</u>, <u>supra</u>, 617 <u>F.</u>3d at 248-49 (internal citations omitted)). Thus, the only potential pathway for admission of this testimony was <u>Rule</u> 404(b), which was unavailable because the State could not satisfy the <u>Cofield</u> factors.

41

One final problem merits discussion. The trial court failed to follow the <u>Rose</u> Court's direction requiring a limiting instruction "to inform the jury of the purposes for which it may, and for which it may not, consider the evidence of defendant's uncharged misconduct, both when the evidence is first presented and again as part of the final jury charge." <u>Rose</u>, <u>supra</u>, 206 <u>N.J.</u> at 161. Rather, the court issued its first limiting instruction addressing J.M.'s testimony eighteen days after J.M. testified. Thus, the jury was not guided on the use that it could make of that testimony for a period of more than two weeks. This was error, an error which may have prejudiced defendant.

We conclude the court mistakenly exercised its discretion when it admitted J.M.'s testimony as evidence of defendant's motive under <u>N.J.R.E.</u> 404(b). J.M.'s proposed testimony did not plainly satisfy the second, third, and fourth prongs of the controlling <u>Cofield</u> test, and the court failed to give a timely limiting instruction to the jury when the testimony was presented. Like the trial court's admission of the balance of the encounter evidence, J.M.'s testimony had the potential to unfairly prejudice defendant in the eyes of the jury. Because we are convinced these errors were not harmless, we conclude

42

that defendant's convictions for aggravated assault and related charges must be reversed.

We have carefully reviewed defendant's remaining points in light of the applicable law and facts, and conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).  In regard to A-0195-12, defendant's judgment of conviction on the weapon-possession charges, we affirm but remand for the entry of an amended judgment of conviction to correct the amount of jail credits.  In regard to A-1423-11, defendant's conviction for aggravated assault and all related charges, we reverse and remand for a new trial.

Affirmed and remanded, in part, and reversed and remanded, in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

43