NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1014-14T3

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

LASHAWN FITCH, a/k/a
LASHAWN D. FITCH,

 Defendant-Appellant.
__________________________

 Submitted January 11, 2017 – Decided September 22, 2017

 Before Judges Simonelli and Carroll.

 On appeal from Superior Court of New Jersey,
 Law Division, Monmouth County, Indictment No.
 09-07-1467.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Michele A. Adubato, Designated
 Counsel, on the briefs).

 Christopher J. Gramiccioni, Monmouth County
 Prosecutor, attorney for respondent (Mary R.
 Juliano, Assistant Prosecutor, of counsel and
 on the briefs).

 Appellant filed a pro se supplemental brief.
PER CURIAM

 Following a jury trial, defendant Lashawn Fitch was convicted

of second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and

N.J.S.A. 2C:15-1 (count one); second-degree possession of a weapon

for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); first-

degree robbery, N.J.S.A. 2C:15-1 (count three); and first-degree

felony murder, N.J.S.A. 2C:11-3(a)(3) (count four). At

sentencing, the trial judge merged counts one and two into count

three and count three into count four, and sentenced defendant on

count four to a forty-year term of imprisonment with an eighty-

five percent period of parole ineligibility pursuant to the No

Early Release Act, N.J.S.A. 2C:43-7.2.

 On appeal, defendant raises the following contentions:

 POINT I

 ADMISSION OF THE TWO TEXT MESSAGES
 THAT REFERENCED [DEFENDANT]
 PURSUANT TO THE CO-CONSPIRATOR
 EXCEPTION TO THE HEARSAY RULE WAS
 ERRONEOUS.

 POINT II

 THE ADMISSION OF OTHER CRIME
 EVIDENCE WAS GROSSLY PREJUDICIAL
 AND DENIED DEFENDANT A FAIR TRIAL.

 POINT III

 THE REPEATED PLAYING OF THE 2009
 VIDEOTAPED STATEMENT OF IAN EVERETT
 CONTAINING INADMISSIBLE HEARSAY WAS

 2 A-1014-14T3
 UNDULY PREJUDICIAL AND DEPRIVED
 DEFENDANT OF A FAIR TRIAL.

 POINT IV

 THE TESTIMONY OF DETECTIVE BALDWIN
 OPINING ON THE CREDIBILITY OF A
 WITNESS AND GUILT OF DEFENDANT WAS
 IMPROPER AND DEPRIVED DEFENDANT OF
 A FAIR TRIAL. (Not raised below).

 POINT V

 THE FAILURE OF THE COURT TO GIVE THE
 APPROPRIATE CHARGE TO THE JURY ON
 ACCOMPLICE LIABILITY WAS ERROR
 MANDATING REVERSAL.

 POINT VI

 DENIAL OF THE DEFENDANT'S MOTION FOR
 [A] NEW TRIAL WAS ERROR.

 POINT VII

 THE SENTENCE IMPOSED UPON THE
 DEFENDANT OF FORTY (40) YEARS WITH
 [EIGHTY-FIVE PERCENT] PAROLE
 INELIGIBILITY WAS EXCESSIVE AND
 SHOULD BE MODIFIED AND REDUCED.

 POINT VIII

 THE AGGREGATE ERRORS DENIED
 DEFENDANT A FAIR TRIAL. (Not raised
 below).

 Defendant raises the following contentions in a pro se

supplemental brief:

 3 A-1014-14T3
POINT I

PROSECUTOR'S REMARKS DURING OPENING
STATEMENTS DENIED DEFENDANT A FAIR TRIAL. (Not
raised below).

POINT II
 TRIAL ERRORS
 (Partially raised)

I. IT WAS PREJUDICIAL FOR THE COURT TO
 PERMIT VIDEO EXCERPTS OF IAN [EVERETT'S]
 MARCH 26, 2009 STATEMENT WITHOUT HOLDING
 A [N.J.R.E.] 104(a) HEARING AND FOR NOT
 INSTRUCTING THE JURY.

II. IT WAS PREJUDICIAL FOR THE TRIAL COURT
 IN PERMITTING VIDEO PLAY-BACK OF IAN
 [EVERETT'S] MARCH 26, 2009 OUT-OF-COURT
 STATEMENTS WITHOUT PUTTING THE REPLAY IN
 PROPER CONTEXT FOR THE JURY.

POINT III

JUROR TAINT (not raised below).

I. THE COURT ERRED IN NOT EXCLUDING JUROR
 #6 . . . AFTER SHE RECEIVED A PHONE CALL
 FROM A CORRECTIONAL FACILITY.

II. BECAUSE JUROR #5 . . . WITHHELD
 PREJUDICIAL INFORMATION ON VOIR DIRE[,]
 DEFENDANT WAS DENIED PEREMPTORY
 CHALLENGE WHICH DEPRIVED DEFENDANT OF A
 FAIR TRIAL.

POINT IV

JURY CHARGE ERRORS DEPRIVED [DEFENDANT OF] A
FAIR TRIAL. (Not raised below).

POINT V

THE AGGREGATE ERRORS DENIED DEFENDANT A FAIR
TRIAL. (Not raised below).

 4 A-1014-14T3
 We have considered the contentions in Points IV and VIII of

defendant's initial brief and Points I, II, III, and V of his pro

se supplemental brief in light of the record and applicable legal

principles and conclude they are without sufficient merit to

warrant discussion in a written opinion. R. 2:11-3(e)(2).

Accordingly, we focus on the remaining contentions.

 I.

 The charges against defendant stemmed from the shooting death

of Nathaniel Wiggins, a marijuana dealer. Ian Everett was the

State's main witness. According to Everett, on the afternoon of

March 11, 2008, he, defendant, Kenny Michael Bacon-Vaughters

(Kenny-Mike), and Aron Pines (Aron) were outside Everett's home

on 9th Avenue in Neptune "chillin' before [Kenny-Mike] went to

work." Everett saw a car pass by with a blue pit bull inside.

The occupant waved at Aron, and Aron waved back. Aron said to

Everett, "that's the weed man."

 At approximately 4:15 p.m., Everett and Aron were outside

Everett's home when a fight erupted in a park across from the

corner of 9th and Ridge Avenue. Everyone fled after the Neptune

Township police arrived. Someone ran into the backyard of

Everett's home. Everett went to the backyard, but saw no one

there. He looked around and saw "a big" gun on the ground, which

he described as a revolver or "shell catcher" or "probably like a

 5 A-1014-14T3
.45 or something crazy like that." Defendant was also in the

backyard at the time. Everett told him to remove the gun from the

backyard, and defendant complied.

 At approximately 8:30 p.m., defendant, Everett, and Aron

returned to Everett's home and were playing video games and

"smoking weed." Defendant had the gun with him and shot it once

while on the back roof of Everett's home. Everett told defendant

and Aron to get the gun out of his home. Everett heard Aron say

that he wanted to take the gun to the weed man's home to rob him.

Everett also heard defendant and Aron talk "about going over there

to rob, to go through [with] it." As defendant and Aron left,

they asked Everett if he was coming, but he declined.

 Everett testified that Aron left his home to go pick up Kenny-

Mike and defendant left approximately twenty to thirty minutes

later after defendant's mother told him to babysit his younger

siblings. He also testified that the next morning, defendant came

to his home and told him that "he heard something about what

[Kenny-Mike] and them did" the night before, but did not say he

was involved.

 Because this testimony contradicted Everett's March 29, 2009

videotaped statement to Detective Daniel Baldwin of the Monmouth

 6 A-1014-14T3
County Prosecutor's Office, the State requested a Gross1 hearing

to determine the admissibility of the videotaped statement. In

the videotaped statement, Everett said defendant and Aron left his

home together, and that defendant told him the next day that Kenny-

Mike knocked on the weed man's door, the weed man wrestled with

Kenny-Mike, "something had happened[,]" and they got rid of the

gun afterwards. On cross- and re-direct examination during the

Gross hearing, Everett recanted nearly his entire videotaped

statement. The judge permitted the State to play the videotaped

statement to the jury during Baldwin's testimony, with

inadmissible statements redacted. Defendant agreed to the

redactions.

 Michael Smith testified that he was a passenger in Wiggins'

car when they drove by a "group of [high school] kids" on 9th

Avenue and Wiggins waved to one of them. At approximately 9:00

p.m., he and Wiggins were shopping at the Walmart in Neptune when

Wiggins received a phone call. As Wiggins drove Smith home, he

told Smith the call was from "the kid" he had waved earlier to on

9th Avenue. Wiggins was skeptical and seemed worried because "the

kid" wanted to purchase a different amount of marijuana than usual

and said he had no car, when Wiggins knew he had a Honda Civic.

1
 State v. Gross, 121 N.J. 1 (1990).

 7 A-1014-14T3
Smith said to Wiggins, "if you feel something's wrong, then . . .

don't go through with it."

 Wiggins' girlfriend, Faith Montanino, testified that she was

in the couple's apartment the evening of March 11, 2008, and saw

Wiggins weighing marijuana in the bedroom. She heard a knock on

the kitchen door and saw Wiggins peer out the bedroom window.

Wiggins said "Oh, shit" and quickly walked to the kitchen door.

She then heard "a loud noise, like a commotion almost" and heard

Wiggins call her name. She walked quickly to the kitchen and saw

the kitchen door ajar and Wiggins on the floor. Wiggins said,

"Faith, I've been shot. Hide the weed. Call the cops." She ran

around the apartment and placed all of the drug paraphernalia in

a bag. She hid the bag in the trunk of her car and went back to

the apartment and called 9-1-1. As she was speaking to the 9-1-1

operator, Wiggins said that Kenny-Mike shot him.

 Police Officers Brett Paulus and Matthew Bailey from the

Eatontown Police Department (EPD) arrived on scene less than one

minute after dispatch. Paulus testified that as he approached the

apartment building, Montanino rushed out crying and yelling that

her boyfriend had been shot. Paulus directed Montanino towards

Bailey and proceeded to the rear of the building where a stairway

led to the couple's second floor apartment. As Paulus scanned the

dark, wooded area behind the building for potential suspects, he

 8 A-1014-14T3
heard someone yelling for help and saw a person lying with his

head outside the doorway of a second floor apartment.

 Paulus proceeded up the stairway and stood next to Wiggins.

Wiggins grabbed Paulus' pant leg and started to pull on it. When

Paulus knelt down beside him, Wiggins said, "I'm dying, oh God,

I'm dying. Kenny-Mike shot me." Paulus asked where Kenny-Mike

lived, and Wiggins replied, "Neptune." Paulus questioned Wiggins

about Kenny-Mike's appearance and whether he had seen a gun, but

Wiggins simply repeated that Kenny-Mike shot him. Wiggins was

transported to the hospital where he later died of his gunshot

wounds.

 The police secured the scene and began searching the exterior

of the building for evidence. In the parking lot of a neighboring

business, the police found a black knit glove, black knit face

mask, and saliva on the ground.

 Montanino eventually went to the EPD, where the police showed

her a photo of Kenny-Mike. She immediately recognized him as one

of Wiggins' frequent marijuana customers and told the police where

he lived in Neptune.

 At approximately 9:30 the next morning, Lieutenant John

Cleary of the EPD drove through the housing development adjacent

to Wiggins' apartment building. On Grant Avenue, which was

approximately one-half mile from the crime scene, Cleary found a

 9 A-1014-14T3
black knit hat with two holes cut out for eyes and purple gloves.

As Cleary was collecting the items, Susan Schmardel, who lived

nearby, exited her home to walk her dog. Cleary asked Schmardel

whether she had noticed the hat and gloves during any of her

previous walks, and she said she had not. Schmardel said she had

walked her dog along the same route at approximately 9:00 the

night before, and was positive the items were not there at that

time.

 The evidence collected from both the parking lot adjacent to

Wiggins' apartment complex and Grant Avenue, along with DNA samples

from defendant, Aron, Kenny-Mike, and Aron's brother, Tahj Pines,

who later became a suspect, were submitted for DNA analysis and

comparison. Tahj's DNA was found on the saliva and black mask

collected from the parking lot, but all four suspects were excluded

as contributors of the DNA on the black glove found in the parking

lot. Defendant could not be excluded as a contributor of the DNA

on the purple gloves found on Grant Avenue, but his DNA was found

on the black cloth hat discovered there.

 The police obtained Wiggins', Aron's, and Kenny-Mike's

cellphone records. Aron's cellphone records revealed he

communicated with Tahj on the night of the murder. The cellphone

records also revealed that in the hours preceding the murder, Aron

called Wiggins at 9:09 p.m. via a cell tower in Neptune. There

 10 A-1014-14T3
were also five calls between Aron and Tahj, and two calls between

Aron and Kenny-Mike, all via cell towers in Neptune or Asbury

Park. Aron called Wiggins at 10:03 p.m., and Wiggins returned the

call one minute later; both calls were via an Eatontown cell tower

less than one mile from Wiggins' apartment. Kenny-Mike received

a call at 10:04 p.m. via the same Eatontown cell tower. There was

no activity on any of the cellphones between 10:07 p.m. and 10:20

p.m.

 Six minutes after Montanino called 9-1-1, Kenny-Mike received

a call and made two calls, all via a cell tower on Route 35 in

Ocean Township between Wiggins' apartment and the suspects' homes.

Between 10:32 p.m. and 10:46 p.m., there were two calls between

Aron and Kenny-Mike, and three calls between Aron and Tahj; all

via cell towers in Neptune or Asbury Park.

 The morning after the murder, Aron called Kenny-Mike at 6:49

and 6:58. At 9:46 a.m., Kenny-Mike sent Aron the first of numerous

text messages relaying updates on the homicide investigation. Two

text messages referenced defendant. One stated "Ayo wats good wit

fitch like he said he told delete this ryt away." The other text

message stated "Fitch said they mite b cumin 4 u . . . they took

him in."

 11 A-1014-14T3
 II.

 The State charged defendant as a co-conspirator and proffered

the two text messages as statements in furtherance of the

conspiracy pursuant to N.J.R.E. 803(b)(5). Defendant filed a

motion to suppress, arguing there was insufficient evidence of a

conspiracy. The judge denied the motion, finding Everett's

statements about defendant's involvement and the black cloth hat

containing defendant's DNA found on Grant Avenue were independent

proof establishing a conspiracy and defendant's participation in

it.

 On appeal, defendant contends in Point I of his initial brief

that admission of the text messages violated the hearsay rule and

his right of confrontation because the conspiracy was over; the

text messages were not made in furtherance of or during the course

of the conspiracy; and there was no evidence of a cover-up or that

he was involved in the robbery. We disagree.

 Our Supreme Court has established the standard of review

applicable a trial judge's ruling on a motion to suppress:

 Appellate review of a motion judge's factual
 findings in a suppression hearing is highly
 deferential. We are obliged to uphold the
 motion judge's factual findings so long as
 sufficient credible evidence in the record
 supports those findings. Those factual
 findings are entitled to deference because the
 motion judge, unlike an appellate court, has
 the opportunity to hear and see the witnesses

 12 A-1014-14T3
 and to have the feel of the case, which a
 reviewing court cannot enjoy.

 [State v. Gonzalez, 227 N.J. 77, 101 (2016)
 (citations omitted).]

In addition, we review a trial court's evidential ruling for abuse

of discretion. State v. Kuropchak, 221 N.J. 368, 385-86 (2015).

An abuse of discretion only arises on demonstration of "manifest

error and injustice[,]" State v. Torres, 183 N.J. 554, 572

(citation omitted), and occurs when the evidence diverts jurors

"from a reasonable and fair evaluation of the basic issue of guilt

or innocence." State v. Moore, 122 N.J. 420, 467 (1991) (citation

omitted). Applying the above standards, we discern no reason to

reverse the admission of the text messages.

 "Hearsay" is "a statement, other than one made by the

declarant while testifying at the trial or hearing, offered in

evidence to prove the truth of the matter asserted." N.J.R.E.

801(c). Hearsay is inadmissible unless it falls within one or

more of the exceptions enumerated in the evidence rules. State

v. Branch, 182 N.J. 338, 348 (2005). Hearsay "admitted contrary

to this State's evidentiary rules and decisional laws . . .

violate[s] the Federal and State Confrontation Clauses." Id. at

353. "Both the hearsay rule and the right of confrontation protect

a defendant from the incriminating statements of a faceless accuser

who remains in the shadows and avoids the light of court." Id.

 13 A-1014-14T3
at 348. The exceptions to the hearsay rule "are justified

primarily because the circumstances under which the statements are

made provide strong indicia of reliability." State v. Savage, 172

N.J. 374, 402 (2002) (quoting State v. Phelps, 96 N.J. 500, 508

(1984)).

 The co-conspirator exception to the hearsay rule, embodied

in N.J.R.E. 803(b)(5), permits a statement to be admitted against

a party if the statement was made while the party and declarant

were allegedly participating in a plan to commit a crime or civil

wrong and the statement was made in furtherance of that plan, even

if the plan was frustrated. See Savage, 172 N.J. at 404. The

rationale for the co-conspirator exception is the concept that

"[p]articipation in a conspiracy confers upon co-conspirators the

authority to act in one another's behalf to achieve the goals of

the unlawful scheme." State v. Harris, 298 N.J. Super. 478, 487

(App. Div.), certif. denied, 151 N.J. 74 (1997). "Since

conspirators are substantively liable for the acts of their co-

conspirators," it follows that "they are equally responsible for

statements by their confederates to further the unlawful plan."

Ibid. It is well-established that the co-conspirator exception

does not offend the Sixth Amendment's guarantee of a defendant's

right to confront the witnesses against him. State v. Boiardo,

111 N.J. Super. 219, 229 (App. Div.), certif. denied, 57 N.J. 130

 14 A-1014-14T3
(1970), cert. denied, 401 U.S. 948, 91 S. Ct. 931, 28 L. Ed. 2d

231 (1971).

 To qualify for admissibility under N.J.R.E. 803 (b)(5), the

State must show that: (1) the statement was made in furtherance

of the conspiracy; (2) the statement was made during the course

of the conspiracy; and (3) there is "evidence, independent of the

hearsay, of the existence of the conspiracy and defendant's

relationship to it." Savage, supra, 172 N.J. at 402 (quoting

State v. Phelps, 96 N.J. 500, 509-10 (1984)). The "nature of the

hearsay should engender a strong sense of inherent

trustworthiness." Phelps, supra, 96 N.J. at 511. The first two

factors "reflect notions that an agent's statements are

vicariously attributable to a principal." Id. at 510. The third

factor "reduces the fear that a defendant might be convicted or

held liable in damages solely on the basis of evidence that he has

had no opportunity to impeach or refute." Id. at 510-11.

 A conspiracy continues until its objective is fulfilled.

State v. Cherry, 289 N.J. Super. 503, 523 (1995). If a statement

is made after the conspiratorial objective is completed, it is

generally not admissible under the co-conspirator exception.

State v. Sparano, 249 N.J. Super. 411, 420-21 (App. Div. 1991).

However, a conspiracy may continue beyond the actual commission

of the object of the conspiracy if it is shown that a conspirator

 15 A-1014-14T3
enlisted false alibi witnesses, concealed weapons, or fled in

order to avoid apprehension. Cherry, supra, 289 N.J. Super. at

523-24. Moreover, statements relating to past events may be

admissible if they are "in furtherance" of the conspiracy and

"serve some current purpose, such as to . . . provide reassurances

to a co-conspirator or prompt one not a member of the conspiracy

to respond in a way that furthers the goals of the conspiracy."

State v. Taccetta, 301 N.J. Super. 227, 253 (App. Div. 1997).

 The trial court must make a preliminary determination of

whether there is independent proof of the conspiracy. N.J.R.E.

104(b). Specifically, the court must determine whether there is

independent evidence "substantial enough to engender a strong

belief in the existence of the conspiracy and of [the] defendant's

participation." Phelps, supra, 96 N.J. at 511. The requisite

independent evidence may take many different forms, "such as books

and records, testimony of witnesses, or other relevant evidence.

There may be a combination of different types of proof." Id. at

511. "Thus, if the hearsay evidence is corroborated with

sufficient independent evidence that engenders a strong sense of

its inherent trustworthiness, it is admissible under the co-

conspirator exception." Savage, supra, 172 N.J. at 403.

 Here, the two post-homicide text messages mentioning

defendant satisfied all three factors for admissibility and did

 16 A-1014-14T3
not violate defendant's confrontation rights. Although defendant

asserts the conspiracy had ended when the robbery was completed,

a conspiracy may continue beyond the commission of the object of

conspiracy. Cherry, supra, 289 N.J. Super. at 523-24. In Cherry,

we held that statements made after a murder by a co-conspirator

to his wife, explaining her alibi role, were made in the course

of the conspiracy because the husband was still planning to conceal

himself from detection and dispose of evidence. 289 N.J. Super.

at 523-24. The conspiracy in this case continued after the initial

conspiratorial object of robbing Wiggins was satisfied because the

text messages show that defendant and his co-conspirators

continued to collaborate about the homicide.

 Moreover, the text messages satiate the remaining two prongs

to qualify for admissibility pursuant to the co-conspirator

hearsay exception. The text messages between Aron and Kenny-Mike

were exchanged in furtherance of the conspiracy, and the exchange

of messages "promoted, or [were] intended to promote, the goals

of the conspiracy" by evading apprehension. State v. Farthing,

331 N.J. Super. 58, 84 (App. Div. 2000) (quoting United States v.

Beech-Nut Nutrition Corp., 871 F. 2d. 1181, 1199 (2d. Cir.), cert.

denied sub nom., Lavery v. United States, 493 U.S. 933, 110 S. Ct.

324, 107 L. Ed. 2d 314 (1989)). The text messages reassured Aron

that defendant was abiding by their plan, and encouraged him to

 17 A-1014-14T3
destroy evidence and evade apprehension by directing him to delete

the message. The text message stating "Fitch said they mite b

cumin 4 u . . . they took him in" apprised Kenny-Mike that

detectives had interviewed defendant and warned Kenny-Mike that

investigators might be coming for him, hindering Kenny-Mike's

apprehension and prosecution.

 Finally, there was ample evidence independent of the text

messages supporting the judge's determination that a conspiracy

existed and defendant participated in it. Everett's videotaped

statement described the formation of the conspiracy to commit the

robbery, recounting both Aron and defendant speaking about robbing

Wiggins. In addition, defendant's DNA was found on the black

cloth hat recovered less than a mile from Wiggins' apartment.

Defendant was similarly involved in the post-homicide conspiracy

to avoid apprehension, discarding his mask during flight after the

homicide, and admitting to Everett that "they got rid of the gun."

Accordingly, admission of the text messages was proper.

 III.

 For the first time on appeal in Point II of his initial brief,

defendant challenges evidence of alleged other crimes he committed

by firing a gun not identified as the murder weapon under

circumstances where he was not accused of being the shooter and

smoking weed prior to the robbery. Because defendant did not

 18 A-1014-14T3
raise this argument at trial, we review it for plain error. R.

2:10-2; State v. Macon, 57 N.J. 325, 336 (1971). We will reverse

on the basis of an unchallenged error only if it was "clearly

capable of producing an unjust result." Macon, supra, 75 N.J. at

337. To reverse for plain error, we must determine there is a

real possibility that the error led to an unjust result, that is,

"one sufficient to raise a reasonable doubt as to whether [it] led

the jury to a result it otherwise might not have reached." Id.

at 336.

 "[E]vidence of other crimes, wrongs or acts is not admissible

to prove the disposition of a person in order to show that such

person acted in conformity therewith." N.J.R.E. 404(b). However,

"[s]uch evidence may be admitted for other purposes, such as proof

of motive, opportunity, intent, preparation, plan, knowledge,

identity or absence of mistake or accident when such matters are

relevant to a material issue in dispute. Ibid.

 "The threshold determination under Rule 404(b) is whether the

evidence relates to 'other crimes,' and thus is subject to

continued analysis under Rule 404(b), or whether it is evidence

intrinsic to the charged crime, and thus need only satisfy the

evidence rules relating to relevancy, most importantly, Rule 403."

State v. Rose, 206 N.J. 141, 179 (2011); see also State v.

Sheppard, 437 N.J. Super. 171, 193 (App. Div. 2014) (holding that

 19 A-1014-14T3
if the evidence is intrinsic, "N.J.R.E. 404(b) does not apply

because the evidence does not involve some other crime, but instead

pertains to the charged crime").

 As the Court acknowledged, the term "intrinsic" is not easy

to define with precision. Rose, supra, 206 N.J. at 178. To

address this difficulty, the Court adopted the test articulated

in United States v. Green, 617 F.3d 233, 248 (3d Cir. 2010),

limiting intrinsic evidence to two narrow categories of evidence.

Id. at 180. The first category applies to evidence that "directly

proves" the charged offense. Ibid. The operative factor is

whether the evidence has probative value as to the charged offense.

The Court explained that "[t]his gives effect to Rule 404(b)'s

applicability only to evidence of 'other crimes, wrongs, or acts.'

If uncharged misconduct directly proves the charged offense, it

is not evidence of some 'other' crime." Ibid. (quoting Green,

supra, 617 F.3d at 248-49). The Court adopted Green's definition

of the second category of intrinsic evidence, stating that

"uncharged acts performed contemporaneously with the charged crime

may be termed intrinsic if they facilitate the commission of the

charged crime." Ibid. (quoting Green, supra, 617 F.3d at 249).

 Evidence of defendant's conduct with the gun at Everett's

home was intrinsic evidence because it directly proved the charged

crimes. Defendant removed the gun from Everett's backyard and

 20 A-1014-14T3
later returned to Everett's home with it and discharged it on the

back roof. Defendant and Aron discussed robbing the weed man

using the gun, they left Everett's home with the gun, and the day

after the homicide defendant told Everett "they got rid of the

gun." Further, Everett described the gun as a "revolver" and

"shell catcher," which was consistent with the testimony of the

State's expert that the .38 caliber bullet recovered from Wiggins'

body could have been fired from a revolver, and with evidence that

no shell casings were found at the scene.

 The evidence in this case indicates the gun defendant

possessed and discharged mere hours before the robbery and homicide

was the same gun used by his co-conspirators to commit those crimes

and supports the inference that defendant allowed use of the gun

to promote the conspiracy. Therefore, the evidence was admissible

as intrinsic evidence because it directly proved defendant was

part of the conspiracy.

 There is no merit in defendant's claim that he was prejudiced

by admission of evidence that he "smoked weed." Defendant did not

object to this evidence or request a curative or limiting

instruction, and he twice referred to it during summation.2

Moreover, this evidence was material to facts at issue in

2
 Defendant appeared pro se at trial and was assisted by standby
counsel.

 21 A-1014-14T3
determining defendant's guilt on the charged offenses, indicating

that he knew Wiggins and supplied the catalyst for the formation

of the robbery plan. We conclude that the complained-of error did

not rise to the level of plain error.

 IV.

 Everett's redacted videotaped statement was played to the

jury during Baldwin's testimony; certain portions were played

during the prosecutor's summation; and the video was re-played to

the jury in defendant's presence during deliberations in response

to a jury question. After the jury resumed deliberations,

defendant lodged a hearsay objection to the following statements:

 BALDWIN: What did he tell you? Take your
 time. I need you to think, man. Just be
 truthful with us.

 EVERETT: I’m being truthful with you.

 BALDWIN: Yeah, no, the story—the story is
 correct. I mean, the story adds up,
 corroborated with the . . . other information
 we've learned from other people we've talked
 to, so I know you’re being truthful with us.
 Just take your time and think about exactly
 what he said to you.

As the interview concluded, the detectives said the following to

Everett and his mother:

 BALDWIN: [Everett] witnessed things that led
 up to the homicide.

 22 A-1014-14T3
 DETECTIVE NELSON: And the information that
 he's given, we've heard it one, two, three
 times before, so it's like—
 BALDWIN: Just wanted him to be truthful with
 us and I'm glad, and I thank you for bringing
 him down. I'm glad you're being truthful with
 us. We know—we knew the story.

 EVERETT: I wish I told you earlier.

The judge overruled the objection and denied defendant's request

for a limiting instruction.

 Defendant contends in Point III of his initial brief that

these portions of Everett's videotaped statement constituted

inadmissible hearsay prohibited by State v. Bankston, 63 N.J. 263

(1973). Defendant also contends the judge erred in failing to

issue a limiting instruction on the limited use of this evidence,

and his confrontation rights were violated.

 Defendant's untimely objection does not alter the standard

of review from one for plain error. See R. 1:7-2 (requiring

objection "at the time the ruling or order is made or sought");

State v. Weston, 222 N.J. 277, 294 n. 5 (2015); Pressler &

Verniero, Current N.J. Court Rules, comment 2 on R. 1:7-2 (2017)

(noting the need to provide the court with a basis of complaint

to permit an opportunity to respond). The question therefore is

whether the detectives' remarks prejudiced a substantial right of

defendant and therefore were capable of producing an unjust result.

 23 A-1014-14T3
State v. Douglas, 204 N.J. Super. 265, 272-73 (App. Div.), certif.

denied, 102 N.J. 378 (1985). We conclude they did not.

 In Bankston, the Court concluded that both the Confrontation

Clause and the hearsay rule are violated when, at trial, a police

officer conveys, directly or by inference, information from a non-

testifying declarant to incriminate the defendant in the crime

charged. 63 N.J. at 268-69. To protect the defendant from the

confrontation problems associated with such evidence, restrictions

have been placed on Bankston-type testimony. An officer may

explain the reason he approached a suspect or went to a crime

scene by stating he did so "upon information received," Banskton,

supra, 63 N.J. at 268, but the officer may not become more specific

by repeating details of the crime, or implying he received evidence

of the defendant's guilt, as related by a non-testifying witness.

State v. Luna, 193 N.J. 202, 216-17 (2007).

 The Court affirmed and reinforced the Bankston rule in State

v. Branch, 182 N.J. 338 (2005). In Branch, an officer testified

he had included the defendant's photograph in an array "because

he had developed defendant as a suspect 'based on information

received.'" Id. at 342. The Court determined the officer's

testimony was inadmissible hearsay, engendering a jury that "was

left to speculate that the detective had superior knowledge through

hearsay information implicating defendant in the crime." Id. at

 24 A-1014-14T3
348. The Court noted "[b]ecause the [informant] . . . was not

called as a witness, the jury never learned the basis of [the

informant's] knowledge regarding defendant's guilt, whether he was

a credible source, or whether he had a peculiar interest in the

case." Ibid. The Court emphasized that the introduction of this

"gratuitous hearsay testimony violated defendant's federal and

state rights to confrontation as well as our rules of evidence."

Ibid. The Court concluded by finding the violation sufficiently

prejudicial, warranting reversal as plain error. Id. at 354.

 The present case is distinguishable from Bankston. The

complained-of statements came from a videotaped statement, not

live testimony. Defendant had the videotaped statement in his

possession well before trial, and also had the opportunity to

request redactions. Before the videotape was played to the jury,

defendant had the opportunity to view the proposed redactions, and

he accepted them. The hearsay rule does not apply to facts agreed

to by the parties. State v. Neal, 361 N.J. Super. 522, 534 (App.

Div. 2003) (citing N.J.R.E. 101(a)(4)). Accordingly, the judge

properly rejected defendant's untimely hearsay challenge. See

State v. Lanzo, 44 N.J. 560, 566 (1965) (noting that "the defendant

is in no position to urge prejudicial error" where he was afforded

the opportunity and declined to propose redactions to an admissible

statement).

 25 A-1014-14T3
 In addition, there was no plain error as to the lack of a

limiting instruction. Examining plain error in the Bankston

context, hearsay testimony is prejudicial to the defendant when

the State's case is tenuous. However, "when a case is fortified

by substantial credible evidence—for example, direct

identification of the defendant—the testimony is not likely to be

prejudicial under the 'plain error' rule." State v. Irving, 114

N.J. 427, 448 (1989). While Everett's videotaped statement was

undoubtedly the key to proving defendant's guilt, its reliability

was established through independent evidence, nullifying any

perceived Bankston prejudice.

 Specifically, Smith testified that he and Wiggins drove by

Everett's home in Neptune and Wiggins waved to Aron, corroborating

Everett's statement that defendant's co-conspirator was at his

home and saw Wiggins. Police Officer Marques Alston corroborated

Everett's statement that a person fleeing the fight ran through

his backyard and discarded a gun. Aron's cellphone records

indicating that a call was made to Wiggins from the Neptune area

immediately before the robbery corroborated Everett's statement

that defendant and Aron talked about going to Wiggins' home. The

ballistics report, noting both the absence of a shell casing on

scene and that Wiggins was likely murdered with a revolver, was

 26 A-1014-14T3
consistent with Everett's statement that defendant had possession

of and discharged a revolver.

 The text message mentioning defendant and the police

investigation established the co-conspirators' contact and

collaboration with each other after the robbery and corroborated

Everett's account of defendant's identification of the

participants in the robbery. Finally, the physical evidence

collected from the nearby parking lot containing Tahj's DNA and

the hat and gloves discovered on Grant Avenue containing

defendant's DNA supported Everett's explanation of the robbery.

Accordingly, there was no plain error in the admission of the

detectives' statements and the judge's failure to proffer a

limiting instruction.

 V.

 Defendant contends for the first time on appeal in Point IV

of his initial brief that Baldwin's testimony opining on Everett's

credibility and defendant's guilt was improper and deprived him

of a fair trial. Defendant relies on Baldwin's testimony on direct

examination that he "did [not] believe Everett was involved in the

death of . . . Wiggins."

 Defendant also relies on Baldwin's testimony that Everett

"was reluctant, it took him a year to be truthful about

[defendant's] involvement in this homicide, so I didn't want any

 27 A-1014-14T3
harm to come to him." However, because this testimony occurred

on cross-examination, it constituted invited error. Under the

invited error doctrine, trial errors that "were induced,

encouraged or acquiesced in or consented to by defense counsel

ordinarily are not a basis for reversal on appeal[.]" State v.

A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J.

339, 345 (1987)). "In other words, if a party has 'invited' the

error, he is barred from raising an objection for the first time

on appeal." Ibid. (citation omitted.) Thus, we focus on Baldwin's

direct testimony that he did not believe Everett was involved in

the homicide.

 "[O]ne witness cannot vouch for the truth of another witness's

testimony." See State v. Lazo, 209 N.J. 9, 24 (2012). A witness

is not permitted to vouch for the testimonial account of another

witness "because the ultimate determination of a witness's

credibility falls within the exclusive domain of the jury." R.B.,

supra, 183 N.J. at 337.

 Baldwin's testimony did not constitute improper vouching.

There was no evidence whatsoever suggesting that Everett was

involved in the crimes. Thus, Baldwin's testimony that he did not

believe Everett was involved in Wiggins' death caused no error,

let alone plain error. Baldwin's direct testimony did not

 28 A-1014-14T3
prejudice defendant, as Baldwin did not comment on defendant's

truthfulness, guilt, or innocence, or Everett's credibility.

 VI.

 Defendant challenges the jury charge on accomplice liability

for the first time on appeal in Point V of his initial brief. He

argues that because the jury was charged on robbery as a lesser-

included offense of armed robbery, the judge erred in charging

Model Jury Charge (Criminal), "Liability for Another's Conduct"

(N.J.S.A. 2C:2-6) (1995) Charge #1 - Where defendant is charged

as accomplice and jury does not receive instruction on lesser

included charges (Charge #1). Defendant argues the judge should

have charged Model Jury Charge (Criminal), "Liability for

Another's Conduct" (N.J.S.A. 2C:2-6) (1995) Charge #2 - "Where

defendant is charged as accomplice and jury is instructed as to

lesser included charges" (Charge #2).

 At the charge conference, defendant requested an accomplice

liability charge to address the lesser-included offense of

"accessory after the fact." Defendant never requested Charge #2.

In denying the request, the judge explained that complicity was a

theory of liability, not a charge itself, and therefore "accessory

after the fact" could not be a lesser-included offense of the

accomplice liability theory. Defendant subsequently approved all

the jury charges given in this case.

 29 A-1014-14T3
 "Appropriate and proper jury charges are essential for a fair

trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State

v. Reddish, 181 N.J. 553, 613 (2004)). "The trial court must give

'a comprehensible explanation of the questions that the jury must

determine, including the law of the case applicable to the facts

that the jury may find.'" Id. at 159 (quoting State v. Green, 86

N.J. 281, 287-88 (1981)). "Thus, the court has an 'independent

duty . . . to ensure that the jurors receive accurate instructions

on the law as it pertains to the facts and issues of each case,

irrespective of the particular language suggested by either

party." Ibid. (quoting Reddish, supra, 181 N.J. 613). "Because

proper jury instructions are essential to a fair trial, 'erroneous

instructions on material points are presumed to' possess the

capacity to unfairly prejudice the defendant." Ibid. (quoting

State v. Bunch, 180 N.J. 534, 541-42 (2004)).

 When a defendant fails to object to an error regarding jury

charges, we review for plain error. State v. Funderburg, 225 N.J.

66, 79 (2016). "Under that standard, we disregard any alleged

error [in the charge] 'unless it is of such a nature as to have

been clearly capable of an unjust result.'" Ibid. (quoting R.

2:10-2). "The mere possibility of an unjust result is not enough.

To warrant reversal . . . an error [in the charge] must be

sufficient to raise 'reasonable doubt . . . as to whether the

 30 A-1014-14T3
error led the jury to a result it otherwise might not have

reached.'" Ibid. (quoting State v. Jenkins, 178 N.J. 347, 361

(2004)).

 "When a defendant might be convicted as an accomplice, the

trial court must give clear, understandable jury instructions

regarding accomplice liability." State v. Walton, 368 N.J. Super.

298, 306 (App. Div. 2004). "[A] principal and accomplice, although

perhaps guilty for the same guilty act, may have acted with

different or lesser mental states, thus giving rise to different

levels of criminal liability." State v. Latney, 415 N.J. Super.

169, 174 (App. Div. 2010) (quoting State v. Ingram, 196 N.J. 23,

41 (2008)). "[W]hen an alleged accomplice is charged with a

different degree offense than the principal or lesser included

offenses are submitted to the jury," the court must carefully

impart to the jury the distinctions between the specific intent

required for the offense. State v. Bielkiewicz, 267 N.J. Super.

520, 528 (App. Div. 1993).

 We have extended Bielkiewicz to cases involving robbery.

Where the jury is instructed on both accomplice liability and the

lesser-included offense of robbery, the jury must be told that "an

accomplice who does not have a shared purpose 'to commit a robbery

with a weapon' is guilty of robbery—not armed robbery." State v.

Whitaker, 200 N.J. 444, 459 (2009) (quoting State v. Weeks, 107

 31 A-1014-14T3
N.J. 396, 405 (1987)). Thus, the judge here should have

"additionally charged the jury according to Bielkiewicz's

mandate." Ingram, supra, 196 N.J. at 41.

 However, the error was not sufficient to raise reasonable

doubt as to whether it led the jury to a result it otherwise might

not have reached. In Ingram, the trial court did not properly

instruct the jury under Bielkiewicz that the defendants alleged

to be accomplices to a robbery could be found guilty of the lesser-

included offense of theft. Ingram, supra, 196 N.J. at 36-37.

Nonetheless, our Supreme Court reinstated the robbery convictions,

holding as follows:

 [W]here the indictment substantively charged
 the defendant with both the greater and
 lesser-included offenses, and the trial court
 properly instructed the jury in respect of
 each, the evil Bielkiewicz seeks to guard
 against—that is, that the jury could have
 found that one or more of the defendants were
 guilty of robbery while also finding that one
 or more of the defendants were guilty only of
 the lesser-included offense of theft—does not
 pose the same risk. We therefore conclude
 that it was not reversible error when the
 trial court instructed the jury on the
 elements of the offenses of robbery and theft,
 together with the elements required for
 accomplice liability, without also
 specifically charging that [o]ur law
 recognizes that two or more persons may
 participate in the commission of an offense
 but each may participate therein with a
 different state of mind" and that [t]he
 liability or responsibility of each
 participant for any ensuing offense is

 32 A-1014-14T3
 dependent on his/her own state of mind and not
 on anyone else's.
 [Id. at 40 (quoting Charge #2).]

 Here, defendant asserts that even if he participated in the

robbery, he could have been unarmed and unaware that his co-

defendants were armed. He avers that the judge's accomplice

liability charge failed to differentiate between second-degree

robbery and first-degree robbery, where an actor "is armed with,

or uses or threatens the immediate use of a deadly weapon."

N.J.S.A. 2C:15-1(b). However, applying the Ingram principles,

defendant has failed to show prejudice. The judge properly

instructed the jury on first- and second-degree robbery. Moreover,

although the indictment only charged defendant with first-degree

robbery, the verdict sheet gave the jury the option of convicting

him of either first- or second-degree robbery. Thus, the

Bielkiewicz error here "was not reversible error." Ingram, supra,

196 N.J. at 40.

 Other factors support this conclusion. Defendant was not

tried with his co-defendants. While "[t]he fact defendant was

tried alone is not dispositive," State v. Franklin, 377 N.J. Super.

48, 57 (App. Div. 2005), that fact makes it a more "remote

possibility that [the jurors] were distracted from their task by

a conclusion that the principal had possessed a more culpable

intent than the accomplice." State v. Norman, 151 N.J. 5, 39

 33 A-1014-14T3
(1997). In addition, defendant maintained through this matter

that he was not involved at all in the robbery. While this does

not "eliminate[] the possibility that a faulty accomplice

liability charge could have prejudiced him," State v. Cook, 300

N.J. Super. 476, 488 (App. Div. 1996), it does reduce the

likelihood. Where "a defendant argues that he was not involved

in the crime at all," that helps to show the "defendant suffered

no prejudice" from a failure to instruct the jury on accomplice

liability under Bielkiewicz. State v. Maloney, 216 N.J. 91, 105-

06, 109-10 (2013). As we have held:

 Even if the judge should have instructed the
 jury that it could convict defendant of the
 lesser included offense of second degree
 robbery as [an] accomplice if it found that
 defendant's purpose was only to participate
 in the robbery, and not to commit armed
 robbery, the failure to give a Bielkiewicz
 charge is not plain error . . . [if] there was
 no evidence presented that the principal may
 have acted with a different purpose than the
 accomplice.

 [State v. Oliver, 316 N.J. Super. 592, 597
 (App. Div. 1998), aff'd, 162 N.J. 580 (2000).]

 Considering the totality of the circumstances, including the

entirety of the jury charges, the strength of the State's case,

the nature of the defense, and the verdict sheet, we conclude that

defendant failed to show the omission of the Bielkiewicz language

from the accomplice liability charge was not "clearly capable of

 34 A-1014-14T3
producing an unjust result." R. 2:10-2. The absence of prejudice

is confirmed by defendant's failure to request a Bielkiewicz charge

or object to the charge given.

 VII.

 Relying on State v. Gonzalez, 444 N.J. Super. 62 (App. Div.),

certif. denied, 226 N.J. 209 (2016), defendant contends for the

first time on appeal in Point IV of his pro se supplemental brief

that the use of the phrase "and/or" in the jury charges for first-

and second-degree robbery, accomplice liability, and felony murder

rendered the charges impermissibly ambiguous, generating

uncertainty that the jury was unanimous in finding the elements

of these crimes. We disagree.

 In Gonzalez, the defendant was charged as a co-conspirator

and accomplice with robbery and three counts of aggravated assault.

444 N.J. Super. at 73. We found error in the jury charge on

conspiracy and accomplice liability because the charge referred

to "robbery and/or aggravated assault" when referring to the

substantive crimes the co-defendants were alleged to have

committed for which the defendant was to be considered accountable.

Id. at 73-75. We explained the critical flaw in the charge as

follows:

 [T]he nature of the indictment required that
 the jury decide whether defendant conspired
 in or was an accomplice in the commission of

 35 A-1014-14T3
 a robbery, or an aggravated assault, or both.
 By joining (or disjoining) those
 considerations with "and/or" the judge
 conveyed to the jury that it could find
 defendant guilty of either substantive offense
 — which is accurate — but left open the
 possibility that some jurors could have found
 defendant conspired in or was an accomplice
 in the robbery but not the assault, while
 other jurors could have found he conspired in
 or was an accomplice in the assault but not
 the robbery. In short, these instructions did
 not necessarily require that the jury
 unanimously conclude that defendant conspired
 to commit or was an accomplice in the same
 crime. Such a verdict cannot stand.

 The jury was also told that "to find the
 defendant guilty of committing the crimes of
 robbery and/or aggravated assault charges, the
 State must prove [among other things] that the
 co-defendant] committed the crimes of robbery
 and/or aggravated assault." Assuming the
 "and/or" in this instruction was interpreted
 as being a disjunctive, it is entirely
 possible the jury could have convicted
 defendant of both robbery and aggravated
 assault even if it found [the co-defendant]
 committed only one of those offenses, i.e.,
 the jury was authorized, if it interpreted
 "and/or" in this instance as "or," to find
 defendant guilty of robbery because it was
 satisfied the State proved that [the co-
 defendant] committed an aggravated assault.

 [Id. at 75-77 (citations omitted).]

 The phrase "and/or" is used repeatedly in Charge #1. The

judge's accomplice liability charge mirrored Charge #1 as follows,

in pertinent part:

 So now I'm going to talk to you about
 accomplice liability. Now this is liability

 36 A-1014-14T3
for another's conduct. It's called accomplice
liability.

 The State alleges that the defendant
. . . is legally responsible for the criminal
conduct of co-defendants Kenneth Bacon-
Vaughters, Aron Pines and/or Tahj Pines in
violation of the law which reads in pertinent
part as follows:

 A person is guilty of an offense if
. . . it is committed by his own conduct or
the conduct of another person for which he is
legally accountable, or both.

 A person is legally accountable for the
conduct of another person when he is an
accomplice of such other person in the
commission of an offense. A person is an
accomplice of another person in the commission
of an offense if, with the purpose of
promoting or facilitating the commission of
the offense he, A, solicits such other persons
to commit it and/or B, aids or agrees or
attempts to aid such other persons in planning
or committing it. This provision of the law
means that not only is the person who actually
commits the criminal act responsible for it,
but one who is legally accountable as an
accomplice is also responsible.

 Now, this responsibility as an accomplice
may be equal and the same as he who actually
committed the crimes or there may be
responsibility in a different degree,
depending on the circumstances as you find
them to be. I will further explain this
distinction in a moment.

 In this case, the State alleges that the
defendant . . . is equally guilty of the crimes
committed by co-defendants Kenneth Bacon-
Vaughters, Aron Pines and Tahj Pines, because
he acted as their accomplice with the purpose
that the specific crimes charged be committed.

 37 A-1014-14T3
 In order to find the defendant . . .
guilty of the specific crimes charged, the
State must prove beyond a reasonable doubt
each of the following elements:

 That co-defendants Kenneth Bacon-
Vaughters, Aron Pines and/or Tahj Pines
committed the crimes of armed robbery,
robbery, felony murder or possession of a
firearm for an unlawful purpose; that the
defendant . . . solicited the co-defendants
Kenneth Bacon-Vaughters, Aron Pines and/or
Tahj Pines to commit and/or did aid or agree
or attempt to aid them in planning or
committing the crimes; three, that the
defendant['s] . . . purpose was to promote or
facilitate the commission of the aforesaid
crimes; and four, the defendant . . .
possessed the criminal state of mind that is
required to be proved against the person who
actually committed the criminal act.

 Remember that one acts purposely with
respect to his conduct or a result thereof,
if it is his conscious object to engage in
conduct of the nature or to cause such a
result.

 . . . .

 If you find that defendant . . . with the
purpose of promoting or facilitating the
commission of the crimes solicited co-
defendant Kenneth Bacon-Vaughters, Aron Pines
and/or Tahj Pines to commit them, or aided,
or agreed or attempted to aid them in planning
or committing them, then you should consider
[defendant] as if he committed the crimes.

 In this case, accomplice liability status
should be considered separately for the crimes
of armed robbery, robbery, felony murder, and
possession of a . . . firearm for [an] unlawful
purpose.

 38 A-1014-14T3
 . . . .

 An accomplice may be convicted of proof
of the commission of a crime or of his
complicity therein, even though the person who
is claimed [to have] committed the crime has
not been prosecuted or has been convicted of
a different offense or degree of offense, or
has immunity from prosecution or conviction
or has been acquitted.

 . . . .

In order to convict the defendant as an
accomplice to the crimes charged, you must
find the defendant . . . had the purpose to
participate in that particular crime. He must
act with the purpose of promoting or
facilitating the commission of the substantive
crimes with which he is charged. It is not
sufficient to prove only that the defendant
. . . had knowledge that other person or
persons were going to commit the crimes
charged. The State must prove that it was
defendant['s] . . . conscious object that
. . . the specific conduct charged be
committed.

 In sum, in order to find the defendant
. . . guilty of the crime of accomplice to
commit armed robbery, robbery, felony murder.
possession of a . . . firearm for [an] unlawful
purpose, the State must prove each of the
following elements beyond a reasonable doubt:

 That co-defendant Kenneth Bacon
Vaughters, Aron Pines and Tahj Pines committed
the crimes of armed robbery, robbery, felony
murder and possession of [a] firearm for [an]
unlawful purpose; that defendant solicited
. . . them . . . to commit them and/or did aid
or agree or attempt to aid the co-defendants
Kenneth Bacon-Vaughters, Aron Pines and/or
Tahj Pines in planning or committing [the]
crimes; three, defendant['s] . . . purpose was

 39 A-1014-14T3
 to promote or facilitate the commission of the
 crimes, meaning armed robbery, robbery, felony
 murder or possession of [a] firearm for [an]
 unlawful purpose; and four, that defendant
 . . . possessed the criminal state of mind
 that is required to be proved against the
 person who actually committed the criminal
 acts.

 I remind you again as to the charges of
 armed robbery, robbery, felony murder and
 possession of [a] weapon for [an] unlawful
 purpose to consider the accomplice charge
 separately.

 . . . .

 As I previously instructed, any verdict
 rendered must be unanimous, meaning all
 [twelve] jurors must agree as to the finding
 of guilty or not guilty.

 [(Emphasis added).]

 Unlike Gonzalez, the charge here did not connect the

substantive crimes of defendant's co-defendants with "and/or."

Rather, the jury was charged that to find defendant guilty as an

accomplice, the State must prove: (1) the co-defendants committed

the crimes of armed robbery, robbery, felony murder or possession

of a firearm for an unlawful purpose; (2) defendant's purpose was

to promote or facilitate the commission of the crimes; and (3)

defendant possessed the criminal state of mind required to be

proved against the person who actually committed the crimes. The

charge adequately instructed the jury that it should consider

defendant's accomplice liability status separately for the crimes

 40 A-1014-14T3
of armed robbery, robbery, felony murder, and possession of a

weapon for an unlawful purpose, and determine whether defendant

had the purpose to participate in that particular crime. We

discern no plain error in use of the phrase "and/or" in the

accomplice liability charge.

 We also discern no plain error in use of the phrase "and/or"

in the first- and second-degree jury charges. The judge charged

the jury on first- and second- degree robbery as follows, in

pertinent part:

 A section of our statute provides that
 robbery is a crime of the second degree,
 except that armed robbery is a crime of the
 first degree if the actor, A, purposely
 attempted to kill anyone and/or B, purposely
 inflicted or attempted to inflict bodily
 injury and/or C, was armed with or threatened
 the immediate use of a deadly weapon.

 . . . .

 [I]f you find the State has proven beyond a
 reasonable doubt that the defendant . . .
 committed the crime of robbery as I have
 defined that crime to you, but if you also
 find the State has failed to prove beyond a
 reasonable doubt as to whether, A, defendant
 purposely attempted to kill Nathaniel Wiggins
 and/or B, defendant purposely inflicted or
 attempted to inflict serious bodily injury
 upon Nathaniel Wiggins
 and/or C, defendant was armed with, or used
 or threatened immediate use of a deadly weapon
 at the time of commission of the robbery, then
 you must find the defendant . . . guilty of
 robbery in the second degree.

 41 A-1014-14T3
 If you find the State has proven beyond
 a reasonable doubt that defendant, while in
 the course of committing a theft, A, purposely
 attempted to kill Nathaniel Wiggins and/or B,
 purposely inflicted or attempted to inflict
 serious bodily injury upon Nathaniel Wiggins
 and/or C, was armed with, or used or
 threatened the immediate use of a deadly
 weapon, then you must find the defendant
 . . . guilty of robbery in the first degree.

 [(Emphasis added).]

Defendant argues that the charge was impermissibly ambiguous,

generating uncertainty the jury was unanimous in finding the

elements of these two crimes.

 A unanimity instruction requires unanimous agreement as to

each element of the offense. State v. Gentry, 183 N.J. 30, 33

(2005). Ordinarily, a general jury instruction requiring

unanimity suffices in directing the jury that it must unanimously

agree on the specific predicate of a guilty verdict. State v.

Cagno, 211 N.J. 488, 516-17 (2012). Here, the judge instructed

the jury on unanimity as follows:

 The verdict must represent the considered
 judgment of each juror and must be unanimous
 as to each charge. This means all of you must
 agree if the defendant is guilty or not guilty
 on each charge.

 . . . .

 Now, I'll talk to you just again about
 unanimous verdict. I've mentioned that a few
 times. You may return on each crime charged
 a verdict of either not guilty or guilty. Your

 42 A-1014-14T3
 verdict, whatever it may be as to each crime
 charged, must be unanimous. Each of the
 twelve members of the deliberating jury must
 agree as to the verdict.

 In some circumstances, a general charge of unanimity creates

the possibility of jury confusion or that a conviction may occur

as a result of different jurors concluding the defendant committed

conceptually different acts. State v. Parker, 124 N.J. 628, 641

(1991), cert. denied, 503 U.S. 939, 112 S. Ct. 1483, 117 L. Ed.

2d 625 (1992). In those circumstances, where danger of a

fragmented verdict exists, a specific unanimity instruction is

required. Id. at 641-42. These circumstances include:

 where (1) a single crime could be proven by
 different theories supported by different
 evidence, and there is a reasonable likelihood
 that all jurors will not unanimously agree
 that the defendant's guilt was proven by the
 same theory; (2) the underlying facts are very
 complex; (3) the allegations of one count are
 either contradictory or marginally related to
 each other; (4) the indictment and proof at
 trial varies; or (5) there is strong evidence
 of jury confusion.

 [Cagno, supra, 211 N.J. at 517 (citation
 omitted).]

 A specific unanimity charge was not necessary as none of

these circumstances existed in this case. The State proceeded on

a single factual and legal theory of defendant's guilt. The

underlying facts to support either element A (defendant purposely

attempted to kill Wiggins), or B (defendant purposely inflicted

 43 A-1014-14T3
or attempted to inflict serious bodily injury upon Wiggins),3 were

not very complex, and the allegations of the counts constituted

parts of a single unified theory. Further, there was no evidence

of jury confusion. The judge instructed the jury as to what

evidence to consider when deliberating each charge, and the jury

never sought clarification or expressed uncertainty regarding the

execution of its fact-finding duties. See State v. Gandhi, 201

N.J. 161, 193-94 (2008).

 Despite the judge's use of the phrase "and/or," the charge

required the jury to unanimously determine whether defendant

purposely attempted to kill Wiggins or purposely inflicted or

attempted to inflict serious bodily on Wiggins. Thus, the jury

could find defendant intended to inflict serious bodily injury on

Wiggins, which is a component of an attempt to kill, or that

defendant attempted to kill Wiggins. Both distill into a unanimous

jury verdict.

 Lastly, the judge instructed on felony murder in pertinent

part as follows:

 Criminal homicide constitutes murder
 when it is committed when the actor, either
 acting alone or with one or more other
 persons, is engaged in the commission of or

3
 There was no evidence to support a finding on element C
(defendant was armed with, or used or threatened the immediate use
of a deadly weapon), which eliminates any possibility of a less-
than-unanimous jury finding.

 44 A-1014-14T3
 attempt to commit or flight after committing
 or attempting to commit armed robbery and/or
 robbery, and in the course of such crime or
 the immediate flight therefrom, any person
 causes the death of a person other than one
 of the participants.

 [(Emphasis added).

Use of the phrase "and/or" in the charge was not plain error

because unanimity was not required on the issue of whether

defendant's predicate felony was robbery or armed robbery.

N.J.S.A. 2C:11-3(a)(3) provides that "criminal homicide

constitutes murder when . . . [i]t is committed when the actor,

acting either alone or with one or more other persons, is engaged

in the commission of, or an attempt to commit, or flight after

committing or attempting to commit robbery[.]" Because robbery

is a lesser-included offense of armed robbery, a jury concluding

beyond a reasonable doubt that the defendant was guilty of armed

robbery necessarily also found him guilty of robbery. Here, the

jury unanimously found defendant guilty of armed robbery. Thus,

regardless of the use of the phrase "and/or" in the charge, the

jury here necessarily found defendant guilty of robbery, a

qualifying predicate felony for felony murder.

 VIII.

 Defendant contends in Point VII of his initial brief that his

forty-year sentence is excessive. He argues he had no prior

 45 A-1014-14T3
record, was seventeen years old at the time of the homicide, was

not the shooter, and the shooter received a forty-year sentence.

Defendant also argues that State v. Zuber, 227 N.J. 422 (2017)

compels a remand for re-sentencing because he was a juvenile at

the time of the murder.4

 At sentencing, the judge found aggravating factor N.J.S.A.

2C:44-1(a)(3), "[t]he risk that the defendant will commit another

offense," based on defendant's pending weapons and possession

charges. The judge also found aggravating factor N.J.S.A. 2C:44-

1(a)(9), "[t]he need for deterring the defendant and others from

violating the law," emphasizing the national epidemic of gun

violence in general, and the pervasive problem of gun violence in

Asbury Park and Neptune specifically.

 The judge found mitigating factor N.J.S.A. 2C:44-1(b)(11),

that defendant's imprisonment would entail excessive hardship to

himself and his young son. The judge also considered defendant's

age at the time of the offense and mental health issues. The

judge concluded the aggravating factors substantially outweigh the

single mitigating factor.

 Our review of a sentence is limited. State v. Miller, 205

N.J. 109, 127 (2011). Our basic responsibility is to assure that

4
 The Court decided Zuber after defendant's sentencing.

 46 A-1014-14T3
the aggravating and mitigating factors found by the sentencing

judge are supported by competent, credible evidence in the record.

Ibid. As directed by the Court, we must determine whether:

 (1) the sentencing guidelines were violated;
 (2) the aggravating and mitigating factors
 found by the sentencing court were not based
 upon competent and credible evidence in the
 record; or (3) the application of the
 guidelines to the facts of [the] case makes
 the sentence clearly unreasonable so as to
 shock the judicial conscience.

 [State v. Fuentes, 217 N.J. 57, 70 (2014)
 (quoting State v. Roth, 95 N.J. 334, 364-65
 (1984)).]

We review a judge's sentencing decision under an abuse of

discretion standard. Ibid.

 We discern no abuse of discretion in defendant's sentence.

The judge did not violate the sentencing guidelines, and the record

amply supports his findings on aggravating and mitigating factors.

The sentence is clearly reasonable and does not shock our judicial

conscience.

 Further, Zuber is inapplicable. In Zuber, the court sentenced

the juvenile defendant to an aggregate 110-year sentence with

fifty-five years of parole ineligibility. 227 N.J. at 428. The

Court extended the United States Supreme Court's decision in Miller

v. Alabama, 576 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)

to juvenile offenders who were subject to life-without-parole

 47 A-1014-14T3
sentencing, sentenced to "the practical equivalent of life without

parole," and subject to "multiple term-of-years sentences that,

in all likelihood, will keep him in jail for the rest of his life."

Id. at 446, 448. In this case, defendant received a forty-year

sentence with a thirty-four-year parole bar, and will be eligible

for parole at the age of fifty-three. Unlike in Zuber, defendant's

sentence is not a life sentence or its practical equivalent.

 Affirmed.

 48 A-1014-14T3